463 F.2d 824
 149 U.S.App.D.C. 421, 94 P.U.R.3d 359,
94 P.U.R.3d 398,
2 Envtl. L. Rep. 20,213
 PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Chandeleur Pipe Line
Company, Mobil Oil Corporation, Intervenors.
LONG ISLAND LIGHTING COMPANY and Philadelphia Electric
Company, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent, Chandeleur Pipe Line
Company, Mobil Oil Corporation, Intervenors.
ATLANTA GAS LIGHT COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent, Chandeleur Pipe Line
Company, Mobil Oil Corporation, Intervenors.
 Nos. 71-1197, 71-1198 and 71-1281.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued April 18, 1972.
Decided May 16, 1972.
Rehearing Denied July 19, 1972.
 
 Mr. Morton L. Simons, Washington, D. C., with whom Messrs. John E. Holtzinger, Jr., Paul H. Keck, Washington, D. C., Alan J. Roth and Eugene J. Bradley, Washington, D. C., were on the brief, for petitioners.
 Mr. J. Richard Tiano, Asst. Sol., F. P. C., with whom Messrs. Gordon Gooch, Gen. Counsel, and George P. Lewnes, Asst. Gen. Counsel, F. P. C., were on the brief, for respondent.
 Mr. David B. Ward, Washington, D. C., with whom Mr. Justin R. Wolf, Washington, D. C., was on the brief, for intervenor Chandeleur Pipe Line Co.
 Messrs. Carroll L. Gilliam and Philip R. Ehrenkranz, Washington, D. C., were on the brief for intervenor Mobil Oil Corp.
 Before TAMM, ROBB and WILKEY, Circuit Judges.
 WILKEY, Circuit Judge:
 
 
 1
 This case has returned to us after a remand to the Commission for reconsideration of its original decision to issue the Chandeleur Pipe Line Company a certificate of public convenience and necessity to transport natural gas from offshore Louisiana federal leases to Pascagoula, Mississippi. The gas is there consumed in a petroleum refinery owned by Standard Oil Company of California (Socal), of which Chandeleur (one of the intervenors here) is a wholly-owned subsidiary.[1]
 
 
 2
 When this case was last before this court we directed the Commission to reconsider and articulate its views more precisely with respect to four areas of controversy: (1) the comparative value of end uses to which the natural gas might be put; (2) the incentive for exploration and development of natural gas which might result from permitting Socal and other refinery operators to use their own natural gas; (3) the benefit to the public created by this incentive; and (4) whether there would be a diversion of the natural gas to interstate commerce if the instant certificate should be denied.
 
 
 3
 The Commission proceeded with dispatch, designating the matter for rehearing before an examiner, but omitting the usual examiner's recommended decision in favor of immediate consideration by the full Commission. The resulting opinion is thorough, comprehensive, and convincing. Although it reaches the same result on certification, it does not appear as a rehashed and elaborated justification for a predetermined verdict. We affirm the Commission's action in granting the certificate at issue here.
 
 I. End Use
 
 4
 The task which we set for the Commission in this area was to analyze the claim advanced by petitioner New York Public Service Commission (New York) that use by interstate residential and commercial consumers is a use superior to the industrial use contemplated in Socal's Pascagoula refinery.[2] Much of New York's reliance in this area appears to rest on FPC v. Transcontinental Gas Pipe Line Corp. (1961),[3] to support the contention that the end use by Socal, and particularly any use for "boiler fuel" purposes, is an "inferior" use of natural gas which ought not be permitted in this time of critical gas shortage.[4] We think that the Commission's analysis and ultimate refusal to accept this claim, as set forth in its Opinion No. 560-A,[5] is correct.
 
 
 5
 To take first things first, in Transcontinental Gas Pipe Line Corp. the Supreme Court did not hold that certain industrial uses of natural gas, such as boiler fuel use, were per se inferior, and we are not now prepared so to hold. What the Court did say was that the particular end use was among the factors that the Commission might consider in determining the public convenience and necessity of a certificate application.[6] In different certificate applications the factor of end use will have varying importance. In the case at bar the end use factor is not, by itself, of decisive importance. While it may be true that as to the particular natural gas involved, it would be desirable to have this gas go into the hands of residential rather than industrial users, there is no assurance that this would happen if the certificate were not granted.[7] Of greater importance, we think that satisfaction of the public convenience and necessity would be enhanced by giving more weight to the factor of the "incentive" to natural gas exploration and development, which the Commission hopes to achieve by permitting natural gas producers such as Socal to use their own gas in their refineries.[8]
 
 
 6
 Secondly, it appears from the record that any use for "boiler fuel" would probably represent a very small proportion of the natural gas to be used at the Pascagoula refinery,[9] and any characterization of this small proportion as an "inferior" use could hardly be decisive. Apparently the largest proportion of the gas would be used for processes at the refinery for which there is no physical substitute for the natural gas fuel, or for which conversion to a different fuel would be extremely expensive or physically impossible.[10] If such a conversion were made necessary by a denial of the certificate, the Commission has determined that other fuels, such as low-sulfur fuel oil, which are also in short supply, would have to be substituted for natural gas, and this substitution would itself have undesirable effects on the fuel market.[11] These undesirable effects are not different in kind from the effect on the fuel market if natural gas is used in the refinery, and would be substantially lessened if the Commission's incentive theory proves to be correct.
 
 
 7
 Thirdly, we agree with the Commission that even if the natural gas here in question were to be given to the pipelines presently located near the Chandeleur line (as petitioners have urged) there is nothing in the record that would give assurance that this natural gas would not, by displacement, be devoted to another industrial use.[12] Since, as explained infra, the industrial use by the refinery may bring with it increased development of scarce natural gas, there are reasons for favoring this industrial use over others.
 
 
 8
 In final analysis, by implication from the facts and argument in this case, what the petitioners are asking for is a rule of universal application that producers cannot use their own newly discovered gas in their own refineries, because refinery use is always an inferior use compared to the interstate residential (and industrial) users petitioners represent. We fail to comprehend the merits of such a rule, and without laying claim to any expertise in the intricacies of oil and gas economics, we are doubtful if such a policy would have any but the most discouraging effects.
 
 
 9
 We thus approve of the reasons articulated for the Commission's decision with respect to end use, and move on to the next area of controversy.
 
 II. Incentive
 
 10
 The Commission's theory, articulated but not adequately so in its previous opinion, is that by allowing Socal to utilize its own gas in its Pascagoula refinery there would be created an incentive for this oil company, as well as other oil and gas producers, to undertake exploration and development for both oil and gas.[13] While no particular exploration venture can be guaranteed success, it is well recognized that totality of exploration efforts inevitably bears a direct relationship to the augmentation of the total national petroleum and natural gas reserves.
 
 
 11
 The incentive argument rests not alone on the hopefully inspired search for gas, but also on the well known geological phenomenon, not disputed by the petitioners, that deposits of natural gas are often to be discovered with or near deposits of crude oil. Thus, if the Commission's policy encourages companies such as Socal to search for additional crude oil, given the usual geological arrangement, they will also be discovering new deposits of natural gas, deposits which it is hoped will eventually find their way into the interstate market.
 
 
 12
 It is thus of secondary importance that Socal may have enough natural gas to meet its own needs for several years in the future, if it is allowed to use its own natural gas reserves in its refinery. What is important is whether or not permitting Socal to use its own gas in its refinery will encourage it, other refinery owners, and would-be producers hoping to sell to the Pascagoula refinery, to search for not only natural gas but also additional crude oil, thereby discovering additional deposits of natural gas.[14]
 
 
 13
 Given this relation between deposits of crude oil and natural gas, the Commission's incentive theory may be phrased as follows: At the Pascagoula refinery (and perhaps at other refineries now existing or to be built) natural gas is the least expensive and most efficient fuel to be used in the refining of crude oil.[15] It is, of course, less expensive for Socal to use its own natural gas at Pascagoula than to buy natural gas from other distributors. The more cheaply Socal can acquire natural gas, the more it will be inclined to increase its refinery's production of fuel oil, as this will become more profitable as it becomes less expensive. The more Socal will be inclined to produce more fuel oil at its refinery, the more it must search out crude oil deposits to be refined. The more exploration for oil that Socal (or others) will be doing, the more natural gas it will be discovering in its search for crude oil. Finally, the more natural gas that Socal (or others) discovers, the more natural gas flowing into interstate commerce will be increased, since Socal will have more natural gas than it will be able to use itself.[16] To sum up, if Socal is allowed to use its own natural gas, this will increase its anticipated future demand for both gas and oil, which will increase its present search for both gas and oil, which will lead to more discoveries of gas.
 
 
 14
 On the basis of the record now before us, it cannot be determined for certain that the Commission's incentive policy will work to increase the flow of natural gas into interstate commerce, but it is nonetheless true that the record does not show that such a policy will not work. We must recognize that the formulation of such an experimental policy (where the probability of success is uncertain) is the type activity that the Federal Power Commission was created to perform, and we give great weight to the Commission's determinations regarding this policy.[17] Under the circumstances of this case, involving as it does the application of the Federal Power Commission's particular expertise in an attempt to alleviate the critical gas shortage which now faces the country, we cannot say that the Commission's incentive theory[18] lacks logic, or that the Commission's actions here are unjustified because of reliance in part on this incentive theory as supporting the pipeline certification here challenged. If time should prove the Commission's theory on incentives for exploration and development to be inaccurate, it may change its policies accordingly.
 
 III. The Public Interest
 
 15
 In this area we directed the Commission to reconsider its view that even if the use of the natural gas by Socal in its refinery was not a superior "end use," this factor was outweighed by the public good created by the incentive to exploration and development generated by permitting oil and gas developers to utilize their own reserves in their own refineries.[19] Since we have accepted the Commission's views on the question of "end use," see I, supra, this demonstration of the "public interest" as a counterweight to "end use" becomes somewhat academic. As we have already stressed, we think that the central problem with which the Commission has wrestled has been the critical gas shortage facing the country today, and it is clear that anything that the Commission can do to alleviate this gas shortage is most certainly in the "public interest."
 
 
 16
 At this point it is appropriate to note that as well as hoping to increase exploration and development of gas reserves in the offshore Louisiana area, where Socal has its greatest reserve deposits, the Commission is seeking to encourage owners of refineries to develop gas reserves in the offshore Texas Gulf coast area, where much exploration remains to be done. As the Department of the Interior has tentatively scheduled an oil and gas lease sale for offshore Texas in October 1972,[20] we think that it is particularly in the public interest that whatever incentives the Commission can hold out not be diminished, thus maximizing the possibility of exploration and development of gas reserves by refineries in this area.
 
 
 17
 A final aspect of the public interest issue which the Commission has considered is the question of increased air pollution which theoretically might result from large eastern cities being deprived of this gas supply if it is used at the Pascagoula refinery. We are satisfied that any adverse environmental impact of this use would be far outweighed by the beneficial effects of incentives to exploration and development, if actually realized. Only time will tell whether the Commission's incentive theory will be successful in producing more of the low-pollution natural gas fuels, but we have determined that the Commission should have a chance to find out.[21]
 
 
 18
 The record demonstrates that the Commission gave careful consideration to the questions of air pollution and environmental impact,[22] and thus, contrary to one of petitioners' arguments, we do not think that this is a case of "rather thoroughgoing reluctance to meet the National Environmental Policy Act procedural obligations" which would call for a reversal of the Commission's grant of a certificate to Chandeleur.[23]
 
 IV. Alternative Use
 
 19
 In our opinion remanding to the Commission we directed it to reconsider its view that even if the certificate were denied to Chandeleur there was no assurance that interstate residential and commercial consumers would benefit by such denial of the certificate.[24] In view of our present acceptance of the grant of the certificate because of its being in line with the Commission's incentive policy, our remarks in this area may be limited to the point that if the certificate were not granted, and Socal did not wish to dedicate its gas to interstate commerce, the Commission would not have the power to force it to do so.
 
 
 20
 In FPC v. Transcontinental Gas Pipe Line Corp. (1961)[25] the Supreme Court observed that:
 
 
 21
 . . . it must be realized that the Commission's powers under Sec. 7 [of the Natural Gas Act] are, by definition, limited. [Citation omitted.] The Commission cannot order a natural gas company to sell gas to users that it favors; [footnote omitted] it can only exercise a veto power over proposed transportation and it can only do this when a balance of all the circumstances weighs against certification.[26]
 
 
 22
 In view of this statement of the Commission's powers, and in light of the possible validity of its incentive policy which is to be implemented by the granting of this certificate, it cannot be said that "a balance of all the circumstances" weighs against granting the certificate here. We think that this means that this court does not have the power to order the Commission to direct a sale to users other than Socal.[27]
 
 
 23
 In our previous opinion[28] we pointed out the likelihood, based on an assessment of the usual financial factors, that the gas reserves would continue to be dedicated to the Pascagoula refinery, flowing through the existing pipeline, if the new pipeline were never certificated. Use, or full use, of the new pipeline might well await the discovery by Socal or others of more gas reserves in a convenient location. If the Commission's theory on incentives has validity, such discovery might well be discouraged and delayed if petitioners prevailed.
 
 
 24
 In this difficult time of critical gas shortage, a reviewing court must be particularly careful to ensure that the Commission is permitted to carry out its policy-making functions which Congress gave it in the Natural Gas Act, and we may not substitute our policy judgments for those of the Commission. For the reasons stated above, on the usual standards of judicial review of administrative agency action,[29] the grant of the certificate is
 
 
 25
 Affirmed.
 
 
 
 [1]
 Public Service Commission of New York v. FPC, 141 U.S.App.D.C. 174, 436 F.2d 904 (1970)
 
 
 [2]
 Id., 141 U.S.App.D.C., at 175, 436 F.2d, at 905
 
 
 [3]
 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377
 
 
 [4]
 On the nature and extent of the country's current gas shortage, which is of crucial importance to this case, see generally Public Service Commission v. FPC, 151 U.S.App.D.C. --, 467 F.2d 361 (1972), and sources there cited
 
 
 [5]
 31 December 1970 (unpublished), R. 2936-59
 
 
 [6]
 365 U.S., at 30-31, 81 S.Ct. 435
 
 
 [7]
 See IV, infra
 
 
 [8]
 See II, infra. It must be stressed that the four areas discussed in the Commission's Opinion 560-A and under discussion here are intimately related, and in order to determine where the public convenience and necessity lies, they must all be evaluated together. While there are some impressive points argued by the petitioners in each of the four areas, we think that when the four areas are considered together, the decision of the Commission to grant the certificate is correct
 
 
 [9]
 R. 2942-44, 273, 323
 
 
 [10]
 R. 95-96, 153-54, 162, 313-15, 318
 
 
 [11]
 Opinion 560-A, R. 2943
 
 
 [12]
 R. 2945, 3032. See also R. 511, 540, 631, 935-40, 992, 2677-78
 
 
 [13]
 141 U.S.App.D.C., at 175, 436 F.2d at 905
 
 
 [14]
 Opinion 560-A, R. 2950. It should also be noted that merely because Socal has estimated reserves of natural gas sufficient to operate its refinery for 17 years, this does not mean that it will not be exploring for additional gas reserves before that time. It would, of course, take an extraordinary lack of foresight for Socal to exhaust completely its present natural gas reserves without developing additional sources
 
 
 [15]
 See generally Part I, supra, and Opinion 560-A, R. 2942-43
 
 
 [16]
 This is supported by the undenied fact that even at this time, some of the natural gas discovered by Socal has found its way into interstate commerce, albeit a rather small proportion of the total natural gas reserves discovered by Socal. See Opinion 560-A, R. 2949
 
 
 [17]
 Public Service Commission v. FPC, supra, note 4, 151 U.S.App.D.C. at --, 467 F.2d at 363. See also Delta Air Lines, Inc. v. CAB, 147 U.S.App.D.C. 272, 455 F.2d 1340 (decided 1 December 1971)
 
 
 [18]
 See notes 14-16 and accompanying text, supra
 
 
 [19]
 141 U.S.App.D.C., at 175, 436 F.2d, at 905
 
 
 [20]
 Brief for Respondent Federal Power Commission, at 23
 
 
 [21]
 See text accompanying note 17, supra
 
 
 [22]
 Opinion No. 560-A, R. 2952-3
 
 
 [23]
 Cf. Calvert Cliffs' Coordinating Committee, Inc. v. United States AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971)
 
 
 [24]
 141 U.S.App.D.C., at 175, 436 F.2d, at 905
 
 
 [25]
 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377
 
 
 [26]
 365 U.S., at 17, 81 S.Ct. at 444 (additional emphasis supplied)
 
 
 [27]
 Petitioners have also argued that if Socal refuses to dedicate its gas reserves to interstate commerce it will violate the conditions of its federal lease. This argument is without merit. The statutory provision here in question is 43 U.S.C. Sec. 1337(b) which provides in pertinent part:
 An oil or gas lease issued by the Secretary pursuant to this section shall . . (2) be for a period of five years and as long thereafter as oil or gas may be produced from the area in paying quantities, or drilling or well reworking operations as approved by the Secretary are conducted thereon. . . . [Emphasis supplied.]
 We think that the Commission's reading of this statute, that the lease conditions will be satisfied as long as Socal continues to produce oil or gas on its leased property, is correct. As there is no indication that Socal will cease to produce oil if this certificate is not granted, Socal's lease will be safe.
 
 
 [28]
 141 U.S.App.D.C., at 175-176, 436 F.2d at 905-906
 
 
 [29]
 Administrative Procedure Act, Sec. 10(e), 60 Stat. 244 (1946), 80 Stat. 393 (1966), 5 U.S.C. Sec. 706. See e. g., Greater Boston Television Corporation v. F.C.C., 143 U.S.App.D.C. 383, 395, 444 F.2d 841, 853 (1970), and cases there cited