**ARKANSAS POWER & LIGHT COMPANY, General Motors Corporation and Arkansas Louisiana Gas Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent, Reynolds Metals Company, Arkansas Louisiana Gas Company, General Motors Corporation, Cities Service Gas Company, Arkansas Power & Light Company, Mississippi River Transmission Corporation, Laclede Gas Company, Intervenors.**

Nos. 73–1637, 73–1655, 73–1717 and 73–1800.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 13, 1974.

Decided Aug. 21, 1975.

---

Peyton G. Bowman, III, Washington, D. C., with whom Richard M. Merriman, Washington, D. C., was on the brief, for petitioner in Nos. 73–1637 and 73–1717.

\* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 49 FPC 53, 907, 1316 (1973).

2. 15 U.S.C. § 717c (1970).

Edward J. Grenier, Jr., New York City, with whom Richard P. Noland and Richard J. Pierce, Jr., Washington, D. C., were on the brief, for petitioner in No. 73–1655 and intervenor General Motors Corp. Ronald L. Winkler, Washington, D. C., also entered an appearance for petitioner in No. 73–1655.

Reuben Goldberg, Washington, D. C., with whom David C. Hjelmfelt and Sherman S. Poland, Washington, D. C., were on the brief, for petitioner in No. 73–1800 and intervenor Arkansas Louisiana Gas Co.

John H. Burnes, Jr., Atty., F. P. C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Sol., F. P. C., were on the brief, for respondent.

William W. Bedwell, Washington, D. C., and John J. Mullally, Brooklyn, N. Y., were on the brief, for intervenor Mississippi River Transmission Corp.

Philip R. Ehrenkranz, Washington, D. C., entered an appearance for intervenor Reynolds Metals Co.

Daniel R. Hopkins, Oklahoma City, Okl., and Harry S. Littman, Washington, D. C., entered appearances for intervenor Cities Service Gas Co.

J. David Mann, Jr., Washington, D. C., entered an appearance for intervenor Laclede Gas Co.

Before MOORE,\* *Senior Circuit Judge* for the Second Circuit, and MacKINNON and ROBB, *Circuit Judges.*

Opinion for the court filed by *Senior Circuit Judge* MOORE.

MOORE, *Senior Circuit Judge:*

■ This is a consolidated proceeding to review Opinion Nos. 643, 643–A and 643–B and accompanying orders of the Federal Power Commission.[1] These opinions, issued pursuant to the Commission's authority under sections 4[2] and 5[3] of the Natural Gas Act to regulate plans for the curtailment of natural gas,[4] dealt

3. 15 U.S.C. § 717d (1970).

4. The Supreme Court upheld the FPC's authority to regulate natural gas curtailment plans in *FPC* v. *Louisiana Power & Light Co.,* 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972).

with a plan filed by the Arkansas Louisiana Gas Company. The opinions represent a portion of the Commission's efforts to cope with the apparently still-worsening [5] natural gas shortage. Three companies have petitioned for review: Arkansas Louisiana Gas Company (Arkla), Arkansas Power & Light Company (AP&L), and General Motors Corporation (GM).[6] Each of these parties, along with several other interested companies, has also intervened with respect to the petitions brought by the other petitioners.

Arkla is an integrated gas utility engaged in the production, transportation, distribution, and sale of natural gas. Its operations embrace six different states. Unlike most other natural gas pipeline companies, Arkla distributes the majority of its gas at retail, although a limited amount of pipeline sales are made to other gas companies for resale. In 1971, the FPC issued Order No. 431,[7] a Statement of General Policy directing that gas pipeline companies take steps to provide as adequate service as supplies and capacities would permit, and, where curtailment of deliveries would be required because of inadequate supplies, to file a tariff sheet containing measures to deal with the shortage. In response to Order No. 431, Arkla filed a tariff setting forth its curtailment plan. The plan classified Arkla's sales of natural gas into five priority categories: Categories I, A, B, C, and D (listed in order of lowest to highest priority). Sales in Category I (sales subject to interruption at Arkla's sole discretion) had the lowest priority, and sales in Category D (sales to schools, churches, residences, hospitals, and other human needs customers) had the highest. Categories A, B, and C included different types of industrial customers categorized mainly according to the use made of the gas and the ability to utilize alternate fuels.[8]

By FPC orders the Arkla tariff sheets were temporarily suspended and their use deferred.[9] Hearings on the Arkla plan commenced on July 13, 1971, and on October 13, 1971, the Administrative Law Judge held that Arkla had no immediately critical gas situation and cancelled the tariff sheet. However, in Opinion No. 643, issued on January 8, 1973, the FPC disagreed and reversed the Administrative Law Judge. The Commission found that curtailment was necessary, held that with some modifications Arkla's curtailment plan was just and reasonable, and prescribed a somewhat revised eight-priority curtailment plan, to become effective upon receipt and acceptance by the FPC of revised tariff sheets submitted by Arkla. Certain parties (including GM, which sought and received leave to intervene at this point in the proceedings) then filed petitions for rehearing, which were granted

---

**5.** N.Y. Times, Jan. 5, 1975, p. 1, col. 3; N.Y. Times, Feb. 23, 1975, § 3, p. 3, col. 1.

**6.** GM purchases gas for some of its plants from two natural gas pipeline companies, which in turn purchase gas from Arkla and are affected by Arkla's curtailment plan. GM is therefore "aggrieved" within the meaning of section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), and is entitled to seek review of these orders. See Cincinnati Gas & Electric Co. v. FPC, 101 U.S.App.D.C. 1, 246 F.2d 688 (1957).

**7.** 45 FPC 570 (1971).

**8.** The Commission described Arkla's proposed curtailment plan as follows:

The plan faces (sic) Arkla's sales in several categories interrupt'ble in the following order: Category I, sales which are subject to interruption at seller's discretion under contracts or tariffs which provide in effect for the sale of such gas as seller may be agreeable to selling and buyer may be agreeable to buying; Category A, large users of gas for boiler fuel or other users where alternate fuels can be used, not determined by whether a user has actually installed alternate fuel facilities; Category B, large users for fuel or raw material where an alternate cannot be used; Category C, deliveries to small industrials and regular commercial loads and for use as pilot lights or in accessory equipment to avoid damage to plants; Category D, deliveries for schools, churches, residentials, hospitals and other human needs customers. 49 FPC at 55–56.

**9.** By Arkla's motion made pursuant to section 4(e) of the Natural Gas Act, 15 U.S.C. § 717c(e), the original tariff sheets became effective on October 15, 1971.

by the Commission for purposes of further consideration. On April 10, 1973, the Commission issued Opinion No. 643–A, which modified the curtailment priorities and adopted certain definitions to be employed in connection with the curtailment plan. Finally, in Opinion No. 643–B issued June 8, 1973, the FPC denied all further petitions for rehearing but did grant Arkla an extension of time to comply with the Order which had accompanied Opinion 643–A.[10]

The curtailment plan as finally prescribed[11] by the FPC had the following nine priority-of-service categories:

(1) Residential, small commercial (less than 50 Mcf on a peak day).

(2) Large commercial requirements (50 Mcf or more on a peak day), firm industrial requirements for plant protection, feedstock and process needs, and pipeline customer storage injection requirements.

(3) All industrial requirements not specified in (2), (4), (5), (6), (7), (8), or (9).

(4) Firm industrial requirements for boiler fuel use at less than 3,000 Mcf per day, but more than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.

(5) Firm industrial requirements for large volume (3,000 Mcf or more per day) boiler fuel use where alternate fuel capabilities can meet such requirements.

(6) Interruptible requirements of more than 300 Mcf per day, but less than 1,500 Mcf per day, where alternate fuel capabilities can meet such requirements.

(7) Interruptible requirements of intermediate volumes (from 1,500 Mcf per day through 3,000 Mcf per day), when alternate fuel capabilities can meet such requirements.

(8) Interruptible requirements of more than 3,000 Mcf per day, but less than 10,000 Mcf per day, where alternate fuel capabilities can meet such requirements.

(9) Interruptible requirements of more than 10,000 Mcf per day, where alternate fuel capabilities can meet such requirements.

49 FPC at 913–14. The curtailment plan is based principally on the "end use" which is made of the gas. Each higher priority end use is fully protected from curtailment until all lower priorities have been curtailed 100%. None of the petitioners quarrels with the concept of end use as an appropriate consideration for a curtailment plan. Indeed, this court has upheld end use as a proper differentiating factor for the curtailment of natural gas. *American Smelting & Refining Co.* v. *FPC,* 161 U.S.App.D.C. 6, 494 F.2d 925, 935–36, *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). *Accord, Louisiana* v. *FPC,* 503 F.2d 844, 858 (5th Cir. 1974). But although they do not attack the fundamental basis of the curtailment plan, each of the petitioners is nevertheless dissatisfied with certain aspects of it. The petitioners by no means represent a

10. Arkla filed revised tariff sheets on February 5, 1974, and a permanent curtailment plan was placed in effect on the Arkla system on February 20, 1974.

11. Concurrently with the issuance of Opinion No. 643 on January 8, 1973, the Commission issued Order No. 467, 49 FPC 85, a statement of policy on the priorities of deliveries to be observed by natural gas companies during periods of curtailment. The eight priority-of-service categories were identical to those prescribed in Opinion No. 643. Order No. 467 was subsequently amended by Order Nos. 467–A and 467–B, 48 FPC 217, 583 (1973), and ultimately contained the identical categories prescribed for Arkla in Opinion No. 643–A.

In *Pacific Gas and Electric Co.* v. *FPC,* 164 U.S.App.D.C. 371, 506 F.2d 33 (1974), this court held that as a general statement of policy Order No. 467 was exempt from the rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (1970), and further that Order No. 467 was not reviewable.

On rehearing in the Arkla proceedings, the Commission explicitly disavowed any reliance on Order No. 467, *see* 49 FPC at 910, and other than noting its existence, we must review the Arkla curtailment plan without regard to Order No. 467.

united front; each of them advances different objections and, by way of intervention, opposes at least some of objections raised by the others. We deal with the various contentions seriatim.

### I. Subordination of Gas Used For Generation of Electricity.

. ■ AP&L is an electric public utility operating throughout most of the state of Arkansas. Approximately 97% of AP&L's generating capacity was designed to operate by burning natural gas as a fuel, and in the past Arkla has filled the vast majority of AP&L's natural gas needs.[12] AP&L objects strenuously to the low priority (Category 5) assigned to large volume use of natural gas as a boiler fuel. Only interruptible requirements are given lower priority. Aside from questioning the validity of the Commission's reasons, AP&L contends that this inferior treatment of electric generating companies discriminates against users of electricity and has in fact jeopardized AP&L's ability to serve the needs of its customers. Many of these users of electricity, AP&L points out, are residential and small commercial "human needs" customers of the same type as the gas users the FPC has so assiduously sought to protect by placement in Category 1.

We are, of course, mindful of the present-day uncertainties permeating the entire energy field, and we believe that the Commission has struck a reasonable accommodation between the necessity for allocating scarce natural gas supplies and the need to assure the availability of electric power. Opinion No. 643 gave four reasons for downgrading boiler fuel as an end use:

(1) Boilers make a relatively inefficient use of gas—use for the generation of electricity results in a loss of roughly two-thirds of the heating value of gas used.

(2) Those who use gas in boilers can generally substitute other fuels more readily and at lower cost than other gas users.

(3) Pollution control is more practical because of the large size of individual installations.

(4) Because other fuels can be easily substituted as boiler fuel, the economic dislocations caused by the natural gas shortage will be minimized by curtailing use in boilers before other large scale industrial and commercial uses.

Like the Fifth Circuit, which in *Louisiana* v. *FPC, supra,* reviewed a natural gas curtailment plan in many respects similar to this one, we must reject reasons 3 and 4.[13] The parties cite no portion of the record which supports the Commission's conclusion that boilers provide a better means of pollution control. While this may well be so, we are at a loss to explain how the Commission arrived at this conclusion. Nor can the Commission's theory of minimization of economic impact add independent support to the low priority assignment of boiler fuel. This reason is based on another of the reasons given by the Commission, namely the ability of boiler operators to substitute alternate fuels, and therefore for its validity depends wholly on the accuracy of its underlying premise.

Nevertheless, the remaining reasons given by the Commission are both sufficient justification for the action and adequately supported by the record. The proposition that boiler fuel is an inefficient use of natural gas resulting in significant heat loss was the subject of testimony and does not appear to have been seriously disputed.[14] Thus it seems reasonable to divert natural gas away from use as a boiler fuel to uses where its potential may be more fully realized.

12. R. 1102–03.

13. 503 F.2d at 859. Although the Fifth Circuit was reviewing Opinion Nos. 647 and 647–A, dealing with a curtailment plan for United Gas Pipe Line Company, the FPC had in that case expressly adopted the reasoning of Opinion No. 643 with respect to large volume use of natural gas in boilers. *See* 503 F.2d at 857–58.

14. R. 164, 313, 571.

Similarly, the ability of those using natural gas as a boiler fuel to employ alternate fuels is well-documented. At the time of the hearing, for example, AP&L's generating equipment had the capability of "split-firing" a mixture of oil and natural gas.[15] Furthermore, although conversion to permit the burning of 100% oil would not be without its attendant problems and costs, testimony indicated that such a measure was certainly feasible.[16] Therefore any shortfall in the supply of natural gas that made split-firing an inadequate solution to the shortage can be overcome by conversion of existing equipment.[17]

▪ AP&L persists, however, by arguing that the Commission's reliance on alternate fuels as a solution to the natural gas shortage is unrealistic. It objects first to the Commission's definition of "alternate fuel capability." Opinion No. 643–A defined this "as a situation where alternate fuel could have been utilized whether or not the facilities for such use have actually been installed." 49 FPC at 912. AP&L asserts that this definition is unreasonable since it does not account for those who failed to build alternate facilities under the assumption and with the assurances of an abundant supply of natural gas. But the Commission defined alternate fuel capability without regard to whether facilities were actually installed to avoid penalizing those who had had the foresight to install such facilities. This reason is both sound and just. Since Arkla representatives notified AP&L as early as May 1970 of the impending gas shortage and advised it to make provision for the use of alternate fuels, AP&L[18] had full opportunity to take appropriate action and presumably made its business decisions with reasonable awareness of the potential consequences.

▪ Nor do we believe that present-day uncertainties concerning the available supply of petroleum render the curtailment plan unworkable. To be sure, the ability to procure adequate quantities of oil is certainly more open to question than it once may have been, but we were advised by counsel at oral argument that AP&L continues to generate necessary amounts of electricity, albeit at substantially higher cost than formerly. Moreover, the orders of the Commission make adequate provision for dealing with the vagaries of alternate fuel supplies and assuring continuous electric service. The order accompanying Opinion No. 643–A requires Arkla's tariff to contain "an emergency exemption from curtailment for all electric utility customers to the extent required to avoid the shedding of firm electric load . . . ." 49 FPC at 915. If indeed AP&L is confronted with a situation where electric power to its customers is in danger of being terminated, whether it be because of lack of petroleum, or for some other unforeseen reason, it can apply for an exemption. There is no reason to believe that this procedure would not provide adequate protection to AP&L and its customers.[19]

## II. The Commission's Treatment of Interruptible Service.

"Interruptible", as opposed to "firm", contracts essentially provide that a pipe-

---

15. About one-fifth of AP&L's equipment could operate on a 50%-50% mixture of oil and natural gas. Approximately four-fifths needed a mixture of 65% natural gas to 35% oil. R. 1397–1405.

16. R. 1267–68.

17. Furthermore, AP&L has the necessary interconnections to purchase power from other utilities, provided, of course, the availability of alternate fuels permits the others to export power.

18. R. 598–600, 854–55, 1214–15.

19. We also must reject AP&L's argument that the curtailment plan violates the Commission's duty under section 202(a) of the Federal Power Act, 16 U.S.C. § 824a(a) (1970), to assure "an abundant supply of electric energy throughout the United States." Section 202(a) deals with the FPC's duty to divide the country into regional electric energy districts and has nothing whatever to do with the curtailment of natural gas in times of shortage. Moreover, as the discussion in the text shows, we believe that the Commission has made adequate provision to protect users of electricity.

line company may terminate delivery on short notice. *Monsanto Co.* v. *FPC,* 149 U.S.App.D.C. 396, 463 F.2d 799, 801 (1972). In the Arkla proceedings, the Commission took the position that curtailment should generally fall first upon those customers who purchase gas on an interruptible basis (the reasons for this determination will be discussed in due course). Interruptible requirements of gas were therefore included in the four lowest priority categories.[20] At the same time, however, the Commission left open the possibility that the interruptible nature of a contract might be disregarded in certain circumstances in order to meet the needs of high priority end users.

With respect to this treatment of interruptible service, the various petitioners advance arguments which are fundamentally at odds with each other. On the one hand, GM asserts that the distinction between firm and interruptible service is inappropriate for dealing equitably with the natural gas shortage. On the other, Arkla and AP&L contend that it is improper for the Commission to ignore the interruptible nature of some gas service and in essence to elevate some interruptible customers to the status of firm users. We deal with the latter contention first.

A. *Sales of gas to Mississippi River Transmission Corporation.*

Mississippi River Transmission Corporation (MRT) is a natural gas company which operates a pipeline system and sells natural gas in five states. Until April 1971, when deliveries to MRT ceased, Arkla supplied a portion of the gas needed by MRT to service its market area. The "contract" between Arkla and MRT provided for sales of "whatever volumes of gas Seller may from time to time be agreeable to selling." That is to say, any sales of natural gas to MRT were at Arkla's option. There being no obligation on the part of Arkla to sell any gas, even when supplies were sufficient to allow such sales, the service to MRT can obviously be termed "interruptible" under any definition of that term.[21] Despite the non-existence of a contractual right providing that MRT receive gas from Arkla, the Commission left open the possibility of MRT receiving gas based on the needs and priorities of its customers. In other words, contractual obligations might give way in favor of end uses. In Opinion No. 643–A the Commission stated:

> Finally, AP&L argues that the Commission erred in holding that Mississippi River Transmission Corporation (MRT) is entitled to receive any Arkla gas. We indicated in Opinion No. 643 that even though MRT is an interruptible customer it might take appropriate action to procure an exception from Arkla's classification or proposed curtailment percentage where irreparable injury to life or property might occur because of unusual or special circumstances. . . .
>
> . . . . While Arkla's contract with MRT provides for interruptible service, a curtailment plan which would prevent MRT from receiving any gas, even for residential service, while boiler fuel users receive gas is discriminatory and unjust and unreasonable. As Opinion No. 643 explains,

---

**20.** The Commission defined "firm" and "interruptible" as follows:

> *Firm Service:* Service from schedules or contracts under which a seller is expressly obligated to deliver specific volumes within a given time period and which anticipates no interruptions, but which may permit unexpected interruption in case the supply to higher priority customers is threatened.
>
> *Interruptible Service:* Service from schedules or contracts under which seller is not expressly obligated to deliver specific volumes within a given time period, and which anticipates and permits interruption on short notice, or service under schedules or contracts which expressly or impliedly require installation of alternate fuel capability.

49 FPC at 911–12.

**21.** In fact, the Arkla-MRT contract provides for what might be considered the *most* interruptible type of service, since under other types of interruptible contracts there is an explicit commitment to sell gas when it is available.

we must look beyond contracts between Arkla and its customers to the end-use of gas.

49 FPC at 910–11. Again, in Opinion No. 643–B, the Commission stressed the importance of protecting high priority needs and indicated that "the gas to be delivered to MRT will be measured by the end uses of the gas by MRT's customers as applied to the schedule of priorities." 49 FPC at 1320.

■ Arkla contends that the Commission has imposed a delivery obligation upon it without following the procedures prescribed by section 7 of the Natural Gas Act, 15 U.S.C. § 717f. Section 7(c) requires natural gas companies to obtain a certificate of public convenience and necessity before engaging in interstate sales of natural gas. A certificate covering interruptible sales from Arkla to MRT was issued in 1965. The FPC may not compel a company to accept a certificate that it does not want, *W. W. Harvey,* 31 FPC 880, 881 (1964), and section 7(a)[22] provides the means whereby the Commission can order an enlargement of service already under a certificate when it is in the public interest to do so. Notice and hearing are required, and the Commission is without authority to order enlargement of service when to do so would impair the ability of the natural gas company to render adequate service to its customers. Arkla argues that in effect changing its interruptible contract with MRT to a firm service obligation is an alteration of the applicable certificate of public convenience and necessity, requiring the procedures and findings of section 7(a). Since the Commission has undertaken to regulate curtailment of gas under sections 4 and 5 of the Act, it is undisputed that section 7 procedures have not been followed.

■ On the authority of *American Smelting & Refining Co.* v. *FPC,* 161 U.S.App.D.C. 6, 494 F.2d 925, *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974), we must reject Arkla's claims. *American Smelting* dealt with a temporary curtailment plan for the Southern Division System of the El Paso Natural Gas Company. The customers served by El Paso were of essentially two types. The service provided the so-called East-of-California (EOC) customers was by the terms of their contracts subject to curtailment, whereas El Paso served its California customers under firm contracts. 494 F.2d at 933. El Paso's existing tariffs provided for complete cut-off of all EOC buyers, and historically these customers had borne the entire burden of curtailments. The Commission, however, approved a plan under which all El Paso customers would endure the gas shortage ratably. Against the contention of the "firm" customers that buyers served under "interruptible" contracts received a windfall, since they would not experience the curtailments for which they had contracted, the court upheld the Commission's action. The court noted that section 5(a)[23] of the Natural Gas Act gives

**22.** The Natural Gas Act, § 7(a), 15 U.S.C. § 717f(a) (1970), provides:

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Com-

mission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

**23.** The Natural Gas Act, § 5(a), 15 U.S.C. § 717d(a) (1970), provides:

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find

the Commission authority to override discriminatory or unreasonable contractual arrangements and found that the Commission had properly made the requisite finding of discrimination. 494 F.2d at 934–35. Moreover, the *American Smelting* court expressly dealt with the argument advanced here that the plan as prescribed by the Commission effected a reallocation of gas supplies under section 7(a). Discussing the portion of section 7(a) that prohibits the Commission from ordering enlargement of sales when to do so would impair service to existing customers, the court said:

> Quite clearly, this statutory restriction is not infringed by a curtailment plan based on end use. The curtailment plan does not order the sale of additional gas to one customer to the detriment of another. Rather, it prescribes a formula for allocating insufficient supplies among existing customers. We are not unmindful of Willcox'. argument that *the effect* of the interim plan under review is the same as an order reallocating gas supplies from one customer to another, since the former plan would have protected California customers from service curtailments. Even if this is true, however, we do not think the statutory prohibition applies to curtailment plans. Section 7(a) is plainly intended to regulate *expansions* of service.

494 F.2d at 936 (emphasis in original).

*American Smelting* governs here. In the instant case the FPC found that a plan preventing MRT from getting any gas would be "discriminatory and unjust and unreasonable", and the Commission is therefore entitled to prescribe alternative arrangements. And as in *American Smelting*, providing for interruptible customers to receive gas in accordance with its end use, would not violate section 7.

Having therefore determined that the Commission is not *required* to place interruptible users such as MRT in lower categories than firm users, we now consider whether it was proper for the Commission to do so.

**B.** *The distinction between firm and interruptible service.*

Although many Arkla contracts contain interruptibility clauses, these generally provide that service is interruptible to the extent necessary to protect human needs.[24] Before the Administrative Law Judge and the Commission, Arkla took the position that this was actually firm service[25] (a position also adopted by the Commission in its definition of firm service; see note 20 *supra*). Arkla asserted that only two of its customers (MRT, discussed above, and the Ideal Cement Company) received service on what could legitimately be termed an interruptible basis. As a consequence, only a few purchasers of Arkla gas stood to be affected by any ruling that gave preference to firm customers—the two companies purchasing from Arkla on an interruptible basis and any of Arkla's few pipeline customers who purchased from Arkla for resale and in turn sold on an interruptible basis. The Commission nevertheless gave detailed consideration to the distinction between firm and interruptible users, although not actually classifying

---

that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Com-

mission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

**24.** R. 750.

**25.** R. 459.

any customer in either category. Subject to the approval of the Commission, that task fell to Arkla in the course of preparing its revised tariff sheets.

GM now attacks the distinction as arbitrary, discriminatory, overly vague, and not supported by substantial evidence.

We do not agree with GM that the concepts are so vague as not to be useable. It may be that there are many different versions of interruptibility clauses and some variance among people in the natural gas field as to the meaning of "firm" and "interruptible." But this does not mean that these variations cannot fit within the definitions formulated by the Commission. Although seller and buyer may on occasion have differences of opinion on how a particular contract should be classified, we do not perceive the problems in this area to be insurmountable. We do, however, concur in GM's contention that the reasons given by the Commission are not supported by substantial evidence.[26] Moreover, at least on the basis of the reasons thus far articulated by the Commission, we have doubts about the propriety of the distinction between firm and interruptible service for the purpose of a gas curtailment plan.

The Commission gave two reasons[27] for curtailing interruptible sales before firm sales: the inferior uses of gas sold on an interruptible basis and the expectation that interruptible customers can be expected to have alternate fuel facilities already operational.[28] As stated by the Commission:

[W]e have determined that interruptible sales are for the most part, predicated on end-use considerations; those customers, be they direct sales or indirect sales, who require gas for human needs service or non-substitutable industrial service do not contract on an interruptible basis. Interruptible service, at the lower rates charged for such service, envisions interruption. And accordingly, interruptible customers can most reasonably be expected to have alternate fuel facilities already operational. We conclude, therefore, that curtailment should first fall on those who have not historically borne the full-fixed costs of providing gas service, particularly since these customers are best prepared to accept interruptions in service and clearly do not require uninterrupted service for protection of life or property.

Opinion No. 643, 49 FPC at 66 (footnotes omitted). These assertions seem sound as a pure matter of common sense—if gas supplies are of the utmost importance to a customer, one might suppose that the customer would do all that is possible to assure a steady supply. Failing that, the customer might nevertheless make provision for alternate fuels. Unfortunately, however, what may appear to be common sense seems without record support. The Commission and the parties supporting its position have cited no portion of the record in support of the proposition that interruptible gas is used for inferior purposes. Indeed, there is some indication that schools, churches, and hospitals—presumably all human needs customers—do in fact purchase on an interruptible basis.[29] Nor is there

---

**26.** Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1970) provides, *inter alia*, that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."

**27.** The Commission expressly disavows any reliance on the fact that interruptible customers may pay a lower price for gas as a basis for upholding its order. Respondent's Brief at 50–51.

**28.** We note that the Commission's reference to *already operational* alternate fuel facilities differs from the definition of alternate fuel capability, which does not require that the alternate fuel facilities even be installed. Were the Commission relying on alternate fuel capability to support the distinction between firm and interruptible service, the reason would add nothing, since Categories 6–9 by their terms do not apply unless the interruptible users have alternate fuel capability. *See Louisiana v. FPC, supra,* 503 F.2d at 872.

**29.** R. 1827–28. MRT, an interruptible customer, also asserted that it used Arkla gas to service human needs customers. R. 1478, 1529–31.

significant evidence that interruptible customers have alternate fuel facilities already operational. By and large, curtailments under contract interruptibility provisions were expected to be infrequent and of brief duration.[30] Buyers did not contemplate the perhaps lengthy curtailments caused by an overall shortage of natural gas. Although interruptible customers were on notice to have alternate fuel facilities available, some apparently did not make appropriate arrangements, evidently preferring instead to endure expectedly short periods without fuel supply.[31]

The Commission seeks to avoid the import of this lack of evidentiary support by asserting on appeal that it "by no means sought to prescribe an inflexible system of priorities" but rather "was merely attempting to give Arkla general guidance in the implementation of its curtailment plan." [32] The Commission stresses the existence of emergency relief provisions to overcome inequities resulting from rigid adherence to the priority categories. But this "flexibility" is scarcely supported by language in Opinion No. 643–A that "Arkla *shall* observe the following priority of service categories" in curtailing deliveries. 49 FPC at 913 (emphasis added). And more importantly, the applicable emergency provision in the Order only requires sufficient flexibility to allow supplemental deliveries where required "to forestall irreparable injury to life or property." *Id.* at 915. It is apparent that the emergency provision was only intended to deal with difficulties of users in the very dire circumstances. It cannot ameliorate the evidentiary shortcomings of the Commission's order.

Even if it could be assumed that the reasons stated for adopting the firm-interruptible distinction were supported by substantial evidence, we would have some difficulty with the Commission's treatment of interruptible customers. Like the Fifth Circuit in *Louisiana* v.

*FPC, supra,* 503 F.2d at 872, we question why the fact that interruptible gas is put to inferior uses would support injection of a factor other than end use into the curtailment plan. Would not end use as the sole criterion of a plan adequately insure that interruptible gas is given the appropriate low priority? Furthermore, we are somewhat puzzled by the priority accorded interruptible sales of gas where there is no alternate fuel capability. Under the plan all such interruptible sales go into Category 3, the catch-all for industrial categories not specified in the other categories. 49 FPC at 1319. Yet firm sales for an identical use might be in a different category. For example, firm "plant protection, feedstock, and process needs"—all uses for which no alternative fuel can be used—are in Category 2. Since both reasons given by the Commission for assigning interruptible sales low priorities—inferior end uses and the availability of already operational alternate fuel facilities—are absent with respect to interruptible sales for plant protection, feedstock, and process needs, why should they not be given the same priority as firm sales for the same purposes? Because the Commission's reasons for distinguishing between firm and interruptible service are not supported by substantial evidence, we must remand for further proceedings relating to the supposed inferior use of natural gas by interruptible customers and the alternative fuel capabilities of such customers. If, on remand, the Commission, having then taken further evidence, is inclined to reinsert the distinction, it would be exceedingly helpful if it addressed itself to these questions.

### III. Pipeline Customer Storage Injection Requirements.

As initially promulgated in Opinion No. 643, none of the priority-of-service categories included gas for the storage injection requirements of Arkla's

---

**30.** R. 538–40, 751, 1479–80, 1827–29.

**31.** R. 557–58.

**32.** Respondent's Brief at 43.

customers. *See* 49 FPC at 65. In Opinion No. 643–A, however, the Commission amended Category 2 to include "pipeline customer storage injection requirements." 49 FPC at 914. In explanation of the amendment, the Commission stated:

> To [Category 2] we add "pipeline customer storage injection requirements" because storage gas, although accumulated during the summer, is used to meet the peak demand of winter of high priority customers including residential and small commercial customers, and should be protected on a high priority basis.

49 FPC at 912. Arkla thereafter objected to this amendment, asserting principally that having met the needs of their residential and small commercial customers, the pipeline customers might use the storage gas to service their own industrial customers; alternatively, Arkla might be put in the position of supplying the pipeline's residential and small commercial customers twice over. In essence, Arkla contended that storage gas should be the responsibility of the receiving pipeline. The Commission rejected these contentions in Opinion No. 643–B.

> In our opinion the availability of storage gas is a protection to the customers of the receiving pipeline as well as Arkla. The use of storage can be made possible and encouraged by granting a high priority to deliveries for this purpose. We believe it our responsibility to support the development of storage supplies for the benefit particularly of residential and commercial customers who require space heating gas in the winter. Of course, we do not mean that Arkla should supply gas twice over to a customer with storage capability, and we do not believe the hypothetical circumstances presented by Arkla to be reasonable.

49 FPC at 1320.

Arkla's principal objection before this court is that prior to the amendment pipeline customers' storage injection requirements were never an issue or the subject of any evidentiary presentation. And, indeed, in this observation Arkla seems correct. Although there is some indication in the record of the extent and importance of *Arkla's* storage requirements,[33] there is no evidence concerning the needs of Arkla's pipeline customers, the importance of storage with respect to serving the needs of high priority users, or the ultimate disposition of gas withdrawn from storage by Arkla's pipeline customers. In short, the Commission appears to have acted, not on the basis of the record before it, but rather to further what it regards (on what basis we cannot tell) to be a sound policy.

At oral argument counsel for the FPC took the position that we should sustain the Commission's action as a sound exercise of its policy-making function. Counsel cited *Public Service Commission of the State of New York* v. *FPC*, 149 U.S. App.D.C. 421, 463 F.2d 824, 830 (1972) wherein this court stated:

> In this difficult time of critical gas shortage, a reviewing court must be particularly careful to ensure that the Commission is permitted to carry out its policy-making function which Congress gave it in the Natural Gas Act, and we may not substitute our policy judgments for those of the Commission.

With this proposition we have no quarrel, but in *Public Service Commission* the court at several points stressed the careful consideration given by the Commission and the record support for its conclusions. Here, in contrast, the Commission introduced the issue of pipeline customer storage injection requirements only at a late stage in the proceedings, and without the benefit of the views of the parties before it. The Commission may want to encourage the use and installation of storage facilities, but in this adjudicatory proceeding it is nevertheless obliged to act on the basis of the record before it. Because the Commission apparently did not do so with re-

---

**33.** R. 125–26, 163, 403–07.

spect to pipeline storage injection requirements, we must remand the matter to the Commission for the taking of further evidence on this aspect of the plan.

### IV. Compliance with NEPA.

The National Environmental Policy Act of 1969 (NEPA) requires that "to the fullest extent possible" federal agencies shall issue a statement detailing the environmental impact of any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C) (1970). No party to the Arkla curtailment proceedings raised the issue of compliance with NEPA until the case was before this court.[34] The Commission, having in other proceedings[35] taken the position that NEPA cannot be applied to curtailment plans because the numerous indeterminate variables, such as the extent and duration of the shortage and the availability of alternative fuels, would make any environmental conclusions almost wholly speculative, did not on its own motion file an impact statement. The Fifth Circuit recently held in *Louisiana* v. *FPC, supra,* however, that an impact statement is required for permanent gas curtailment plans. The court neither required the impossible nor intended that curtailment plans be fashioned solely to produce an effect easily described in an impact statement. 503 F.2d at 875. But the court did describe the Commission's duty as:

> To make a good faith effort to describe the reasonably foreseeable environmental impact of each curtailment plan using the five factors listed in NEPA's section 102(C).

503 F.2d at 877. *See also Natural Resources Defense Council, Inc.* v. *Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972).

We agree with the reasoning in *Louisiana* v. *FPC,*[36] and at oral argument counsel for the FPC advised us that the Commission now files impact statements in connection with all permanent curtailment plans. Nevertheless, the Commission argues that section 19(b) of the Natural Gas Act renders us without authority to consider the issue of compliance with NEPA, since the question was not raised before the Commission and no explanation for that failure has been advanced.

We disagree. Section 19(b) provides in part:

> No objection to the order of the Commission shall be considered by the [reviewing] court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.

15 U.S.C. § 717r (1970). In *FPC* v. *Colorado Interstate Gas Co.,* 348 U.S. 492, 498–99, 75 S.Ct. 467, 99 L.Ed. 583 (1955), the Supreme Court held that section 19(b) requires a party to exhaust administrative remedies before seeking judicial review, the purpose being to allow the Commission the opportunity to pass first on a question. But the exhaustion of remedies doctrine which is expressed in the statute is not inflexible; it allows for deviation where the interests of justice dictate. *See Hormel* v. *Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed.

---

**34.** The lateness of the assertion of this issue seems to bespeak a desire to delay the implementation of the permanent Arkla curtailment plan rather than a sincere concern for the effects of the plan on the environment. See also *Environmental Defense Fund, Inc.* v. *EPA,* 160 U.S.App.D.C. 123, 489 F.2d 1247, 1256 n.57 (1973).

**35.** *El Paso Natural Gas Company,* 48 FPC 371 (1972); *United Gas Pipe Line Company,* 49 FPC 179 (1973), *vacated and remanded sub*

*nom. Louisiana* v. *FPC,* 503 F.2d 844 (5th Cir. 1974).

**36.** The Fifth Circuit relied in large measure upon this court's decisions in *American Smelting and Refining Co., supra;* *Calvert Cliffs' Coordinating Committee* v. *AEC,* 146 U.S.App. D.C. 33, 449 F.2d 1109 (1971); *Scientists' Institute for Public Information, Inc.* v. *AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973); and *Natural Resources Defense Council, Inc.* v. *Morton, supra.*

1037 (1941); *Great Falls Community TV Cable Co.* v. *FCC*, 416 F.2d 238, 239 (9th Cir. 1969); *Board of Public Instruction* v. *Finch*, 414 F.2d 1068 (5th Cir. 1969); 3 K. Davis, *Administrative Law Treatise* § 20.06 (1958). And this is a case in which the agency has for all practical purposes had an opportunity to pass on the issue sought to be raised. The Commission expressed its opinion that NEPA did not apply to curtailment proceedings in *El Paso Natural Gas Company*, 48 FPC 371 (1972), and reiterated the same view in *United Gas Pipe Line Company*, 49 FPC 179, 192–93 (1973), *vacated and remanded sub nom. Louisiana* v. *FPC, supra*, seven days after the filing of Opinion No. 643 in this case. There is no reason to believe that its position would have been any different in the Arkla proceedings had the issue been raised. *See Great Falls Community TV Cable Co.* v. *FCC, supra.* Were we to hold that section 19(b) forecloses us from considering the NEPA objection, we would be presented with the unseemly prospect of a violation of a statutory duty now recognized by the Commission to exist without the means to direct compliance. The exhaustion of remedies doctrine surely does not compel such a result, and accordingly we hold that the Commission is required to file an impact statement in connection with the Arkla permanent curtailment plan.

### V. Conclusion.

We hold that the Commission's orders are deficient in several respects. Neither the distinction drawn by the Commission between firm and interruptible service nor the inclusion of pipeline storage injection requirements in Category 2 are supported by substantial evidence. Furthermore, the plan was implemented without preparation of the environmental impact statement required by NEPA. However, the Commission's plan has now been in operation for over a year, and therefore we do not believe that it would further the orderly administration of natural gas curtailment on the Arkla system for us immediately to vacate the plan. Accordingly, the Commission's or-

der may remain in effect for a reasonable period of time pending its prompt action on matters remanded for further consideration. *See American Smelting and Refining Co.* v. *FPC, supra*, 494 F.2d at 949.

So ordered.