543 F.2d 874
 177 U.S.App.D.C. 389
 PUBLIC SERVICE COMMISSION FOR the STATE OF NEW YORK, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Continental Oil Company et al., Intervenors.
ASSOCIATED GAS DISTRIBUTORS, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Phillips Petroleum Company et al., Intervenors.
ASSOCIATED GAS DISTRIBUTORS, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Mobil Oil Corporation, Intervenor.
 Nos. 73-1647, 73-1793 and 73-1794.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 31, 1974.
Decided Jan. 27, 1976.
 
 Richard A. Solomon, Washington, D.C., with whom Peter H. Schiff, Albany, N.Y., was on the brief for petitioner in Nos. 73-1647 and 73-1793.
 Frederick Moring, Washington, D.C., with whom Richard G. Morgan and Thomas C. Watson, Washington, D.C., were on the brief for petitioner in No. 73-1794.
 John R. Staffier, Atty., Federal Power Commission, for respondent. Leo E. Forquer, Gen. Counsel, Federal Power Commission, George W. McHenry, Jr., Sol., Richard A. Oliver and A. Lee Wallace, Attys., Dept. of Justice, were on the brief for respondent.
 
 
 1
 Tom Burton, Houston, Tex., for intervenor Continental Oil Co.
 
 
 2
 Carroll L. Gilliam, Washington, D.C., with whom Tom P. Hamill, Houston, Tex., and Phillip R. Ehrenkranz, Washington, D.C., were on the brief for intervenor Mobil Oil Corp.
 
 
 3
 John L. Williford, Bartlesville, Okl., entered an appearance for intervenor Phillips Petroleum Co.
 
 
 4
 Before ROBINSON and ROBB, Circuit Judges and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.
 
 
 5
 Opinion for the Court filed by Chief Judge MARKEY.
 
 
 6
 Dissenting opinion filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.
 
 
 7
 MARKEY, Chief Judge, United States Court of Customs and Patent Appeals:
 
 
 8
 These appeals present the question of whether the Federal Power Commission (Commission) may permit application of previously established "new" gas rates to flowing natural gas ("old" gas) sold pursuant to a new contract which replaces an expired contract. We answer in the affirmative.
 
 The Facts
 
 9
 The seeds for these appeals were sown by the issuance of the Commission's Opinion No. 639.[1] The Commission announced in No. 639 that the language of previous area rate orders, which had established the criterion for "old" gas rates and "new" gas rates ("vintaging"), would be literally and strictly applied. Specifically, the Commission announced that
 
 
 10
 (t)he wording of Order No. 411, and all other Commission area rate orders or opinions of similar import, stating that 'old' gas rates will be applicable to 'gas sold pursuant to a contract dated prior to October 8, 1969' will be literally and strictly applied. If a gas contract dated prior to October 8, 1969, terminates, and the purchaser and seller enter into a new contract, gas sales under the new contract will be governed by the applicable pricing provisions relating to 'gas sold pursuant to a contract dated after October 7, 1969.' . . . In time this will result in the elimination of a two-price system, a result we believe intended by the original authors of vintaging and a result we wholeheartedly endorse.
 
 
 11
 On applications for hearing the Commission in Opinion No. 639-A clarified this decision, saying (49 FPC 364)
 
 
 12
 the new gas ceiling may be applied upon execution of a new contract for deliveries of gas previously certified and dedicated to the interstate market under a contract which has expired by its own terms. (Emphasis in original.)
 
 
 13
 Under the vintaging concept, employed since 1960, "new" gas had been considered as limited to gas from newly discovered fields. Hence the rate established in the original contract for gas from a particular field applied to gas from additional wells in that field and to later contracts for gas from that field, i. e., all gas from that field was "old" gas. The Commission's present interpretation means that "new" gas rates may be applied without regard to whether the contract covers gas from a newly discovered field or whether it replaces an expired contract for currently flowing gas.
 
 
 14
 On December 21, 1972, Mobil Oil Company (Mobil) applied for permission to abandon certain natural gas sales to Shell Oil Company (Shell). The application indicated that Mobil's sales contract with Shell had expired by its own terms and that a new contract had been negotiated with Texas Eastern Transmission Company (Texas Eastern). Approval of the latter sale was requested in a related application in which Mobil indicated that it would accept an initial rate equal to the area ceiling for "new" gas established in Commission Opinion No. 595[2] for the Texas Gulf Coast Area. As authority for allowing it to collect the "new" gas rate, Mobil cited Commission Opinion No. 639. Associated Gas Distributors (AGD) sought and was permitted to intervene. A hearing was held and on April 16, 1973, the Commission found[3] the proposed abandonment to be "permitted by the public convenience and necessity." The Commission also granted Mobil a temporary certificate authorizing sale under the Texas Eastern contract at the area "new" gas rate. AGD's request for rehearing was denied and a petition to this court (No. 73-1794) to review the Commission's order followed.
 
 
 15
 Contemporaneously, the Commission issued a notice that Continental Oil Company, Getty Oil Company, and Phillips Petroleum Company had filed requests for rate increases, the first two in the Other Southwest Area and Phillips in the Texas Gulf Coast Area. AGD and the Public Service Commission of the State of New York (PSCNY) were permitted to intervene. In each case the oil company had apparently entered into a new contract after the expiration of a prior contract. The Commission's order of April 27, 1973, cited Opinion No. 639 as controlling and granted the requested rates. Following denial of a request for rehearing, this court was petitioned, separately by PSCNY (No. 73-1647) and by AGD (No. 73-1793), to review the Commission's order.
 
 
 16
 The three appeals were consolidated for briefing and argument before us.
 
 Issue
 
 17
 The substantive issue is whether the Commission's orders, permitting application of the "new" gas rates established in prior area rate orders, are authorized. The appealed orders involve individual implementations of the Commission's prior decision to discontinue, gradually and as individual contracts expire, the use of the two-price (vintaging) system. That decision, first announced by interpretative rule in Opinion No. 639, was reviewed and approved as "rational, reasonable, and therefore fully permissible" in Shell Oil Co. v. F.P.C., 491 F.2d 82, 89 (5th Cir. 1974).[4]OPINION
 
 
 18
 The Commission's natural gas regulation efforts, in the short view, appear plagued by conflicting goals. While guarding against artificially inflated rates, it must simultaneously assure a rate schedule sufficient to encourage vigorous development of new gas sources assuring maintenance of an adequate gas supply. In the long view, increased supply may be considered a major prerequisite to reduced rates and the apparent conflict in goals may be seen to evaporate.
 
 
 19
 To prompt the search for and development of new gas deposits, the Commission incorporated into its area rate schedules a two-price system, referred to as the concept of "vintaging." See generally, Placid Oil Co. v. F.P.C., 483 F.2d 880 (5th Cir. 1973), aff'd sub nom. Mobil Oil Corp. v. F.P.C., 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974); Austral Oil Co. v. F.P.C., 428 F.2d 407 (5th Cir.), cert. denied, 400 U.S. 950, 91 S.Ct. 244, 27 L.Ed.2d 257 (1970). Conceived in 1960, the vintaging mechanism first appeared in a completed rate order in 1965. Permian Basin Area Rate Proceeding, 34 FPC 159 (1965), reh. denied, 34 FPC 1068 (1965), remanded sub nom. Skelly Oil Co. v. F.P.C., 375 F.2d 6 (10th Cir. 1967), on rehearing, 375 F.2d 35 (1967), modified sub nom. Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The two-price vintaging policy was viewed from the outset as a temporary measure. Statement of General Policy No. 61-1, 24 FPC 818 (1960).
 
 
 20
 Unhappily, the Commission's creation, vintaging, failed to achieve the desired results. Opinion No. 639 contains "substantial evidence" to support that finding of failure, 15 U.S.C. § 717r(b). As the court said in Shell (491 F.2d at 85 n. 8), "no fact findings are disputed." The Opinion No. 639 findings did in fact include detailed discussion of national gas supply, area gas drilling and production activities, intrastate competition for new gas, the need for deep gas exploration, comparison with costs of supplemental gas, and changes in costs of finding and producing new gas supplies. A major fact finding, pointing toward the failure of vintaging, was that the exploratory gas well count in the area had been 97 wells in 1968 and that within one year after the issuance of Order No. 411 in 1970, applying the vintaging concept to the area, the exploratory gas well count dropped to 47 wells.
 
 
 21
 In Opinion No. 639 the Commission recognized the failure and stated:
 
 
 22
 We believe vintaging to be an anachronism which we should now move to eliminate. Vintaging operates to discourage development of the full productive capacity of acreage committed to the interstate market, for even though such developmental drilling is undertaken at current costs, gas production obtained thereby is priced at the lower of two rates, when it is the higher of the two that is Commission-designed to provide the incentive for development of additional gas supplies. (Original emphasis.)
 
 
 23
 Any change in vintage rates would require a modification by us of rates already determined to be just and reasonable. Many of these determinations are under judicial review and should not now be altered by the Commission. We are free, however, to effect one change in the application of vintaging concepts by interpretation of the specific language used in setting vintage rates, and we now do so.
 
 
 24
 Appellate review of Opinion No. 639 was thorough in Shell and we are in full agreement with the conclusions reached in that case. Petitioners here, as in Shell, do not attack the fact findings in Opinion 639, but only the conclusion reached by the Commission therein with respect to vintaging.
 
 
 25
 We particularly note the following in Shell (491 F.2d at 89-90):
 
 
 26
 A caveat is appropriate at this point. In regard to vintaging, today we are approving FPC's interpretation of certain regulations. We do not reach the question of whether FPC may altogether discontinue the use of vintaging. Rather in each future rate order the Commission must continue to produce substantial evidence to support each essential element of the proposed rate structure. In re Permian Basin Area Rate Cases, supra (390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)). Certainly the absence or presence of vintaging must be regarded as an essential element.
 
 
 27
 Though we concur completely in the quoted "caveat," we note that the instant appeals do not involve an area rate order per se or a "proposed rate structure." The question of whether the "new" gas rates themselves are "just and reasonable" under 15 U.S.C. § 717d(a) is not before us. Presumably, substantial evidence to support those rates is present in the previously issued applicable area rate orders. Those orders are not in dispute here and the present case does not involve an area rate proceeding with all of the protracted fact finding efforts, over a period of years, which such a proceeding entails.
 
 
 28
 We share the concern, expressed in argument before us and by our dissenting brother, that the increased rates permissible under the Commission's new interpretation of area rate schedules may lead to increased gas prices without triggering the desired exploration for additional gas deposits. In Shell (491 F.2d at 89), the court recognized the same argument:
 
 
 29
 But FPC's new interpretation of the vintaging provisions will produce a contrary result, we are told. With "new" and flowing gas at the same price level, the producers will have no incentive to find more gas because they can reap windfall profits by selling cheap flowing gas at the higher rate formerly reserved for "new" gas. If FPC required the producers to show higher costs or new production to justify the higher rate, then FPC would be acting rationally. But it is irrational only to raise gas rates with no quid pro quo required. The producers will not find increased production to be in their best interest, and, as NYPSC puts it, they will "take the money and run."
 
 
 30
 The Fifth Circuit, however, went on to say (Id.):
 
 
 31
 It is also conceivable, however, that a departure from vintaging will serve to increase gas production. In Opinion 639 the Commission stated it believes that vintaging actively discourages new drilling on acreage already committed to the interstate market. If a producer has signed a contract before the division date, all the gas he producers (sic) during the contract's life will receive the low "old gas" price. Even if he drills new wells at current costs, the "new" gas he discovers and produces will be priced as "old" gas, on the basis of historical costs computed in a year long since gone by. Since costs seem to rise inexorably with the passage of time, new drilling will become less attractive as the contract ages. For example, we think it quite likely that a producer operating under a 1964 contract may have little incentive to find expensive 1974 gas only to sell it at bargain 1964 rates. But if he can raise his prices to a uniform rate for both "new" and "old" gas when the old contract expires and a new one is signed, he might be more inclined to drill new wells.
 
 
 32
 If the higher rates do stimulate production, the extra increment for flowing gas will supply needed additional capital for exploration and drilling. Precedent, moreover, supports the view that FPC does not necessarily create an irrational windfall when it includes in the price of flowing gas an increment for further exploration and development. We approved in SoLa II (Placid Oil Co. v. F.P.C., 483 F.2d 880 (5th Cir. 1973), aff'd sub nom., Mobil Oil Corp. v. F.P.C., 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974)) a rate structure with just such an increment.
 
 
 33
 No one can say with certainty that additional gas revenues will lead to an increased gas supply. It is apparent, however, that without sufficient revenue to support exploration for new deposits and further development of old deposits, an increased quantum of such activity is unlikely. The evidentiary factors discussed in Opinion No. 639 support that conclusion. The Commission's action, in modifying its earlier interpretation of its own vintaging mechanism, followed a pragmatic, non-doctrinaire approach based on its experience and expertise. It is not illogical to believe that removal of impediments can result in revival of the impeded activity. It is well, also, to recognize, as did the court in Austral Oil, supra, (at note 46) that:
 
 
 34
 The gas industry is different from metropolitan transit in that it requires a constant infusion of entrepreneurship of the highest order if even basic public needs are to be satisfied. * * * On the other hand, we count upon persons who carefully weigh investment risks for our supply of natural gas. We think the Commission here, having calculated the dangers involved in allowing the gas supply to lapse, and the probabilities that its estimates might be too low, is justified in having added the small noncost factors it thought were necessary. It found that it needed to do so to protect the public interest and not to assure any rights of gas producers.
 
 
 35
 As noted in Placid, supra, the distinction between "old" gas and "new" gas is artificial. We agree with the holding in Shell that the Commission cannot be charged with error because it chose a literal and strict interpretation of particular language in preference to another possible interpretation. The Commission's interpretation of what constitutes "new" gas, and application of that interpretation in the present cases, were reasonable actions falling within its authority.
 
 
 36
 The orders under review are affirmed.
 
 
 37
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge (dissenting):
 
 
 38
 Seven years ago the Supreme Court prescribed standards by which orders of the Federal Power Commission are to be measured on judicial review.[1] The order must not abuse or exceed the Commission's authority.[2] Every essential element of the order must be supported by substantial evidence.[3] Every factor pertinent to protection of the public as well as the private interests at stake must be given "reasoned consideration."[4] And, as the Court more recently emphasized, "application of (these) three criteria of judicial review of Commission orders is primarily the task of the courts of appeals."[5]
 
 
 39
 This court has consistently endeavored to honor that responsibility. It has set aside orders reflecting misuses of Commission power.[6] It has rejected orders without sufficient foundation in the evidence.[7] It has overturned orders omitting "reasoned consideration" of relevant factors.[8] Today, however, the court takes a different course; it affirms orders contemptuous of all three of the criteria governing review. I respectfully dissent.
 
 
 40
 The Natural Gas Act[9] requires just and reasonable rates for all gas regulable by the Commission[10] and declares any other rate unlawful.[11] Prices which producers charge pipelines for gas destined for resale in the interstate market are subject to these commands,[12] and producer-rate orders challenged as unjust or unreasonable must survive application of the judicial-review standards.[13] The rates set by the orders before us lack both evidentiary underpinning[14] and reasoned consideration,[15] and consequently on the administrative record were beyond the authority of the Commission.[16]
 
 
 41
 * The Natural Gas Act effectuates a congressional purpose to hold prices for gas subject to its provisions "at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."[17] Obviously the public interest is served by an ample supply of gas as well as by low prices. So, within a "zone of reasonableness,"[18] the Commission may properly "employ price functionally in order to achieve relevant regulatory purposes; it may, in particular, take fully into account the probable consequences of a given price level for future programs of exploration and production."[19] The statutory goals of adequate supply and fair prices remain harmonious since "(t)he Commission's responsibilities include the protection of future, as well as present, consumer interests,"[20] and the "price is thus just and reasonable . . . because it results in satisfactory programs of exploration, development and production."[21]
 
 
 42
 There is, however, a problem that frequently accompanies inclusion within the price of a noncost factor intended as an incentive to exploration for or development of new sources of gas. The problem is separation of situations wherein higher prices thus constituted are genuine inducements to greater exploratory and developmental effort from situations wherein such prices are not likely to have that effect, and so are apt to do no more than provide financial windfalls to producers. Reasonableness of a rate, so evident when the rate is prudently calculated to bring forth new stores of gas, disappears as that result becomes improbable. Manifestly, protection of the public interest calls for more than an offering of the higher price to the two divergent classes of cases indiscriminately.
 
 
 43
 When the problem was first addressed administratively, the Commission solved it by utilizing the technique known as price vintaging. That response emerged ten years ago in the first area gas-rate order covering production in the Permian Basin[22] when the Commission substituted area ratemaking for case-by-case determination of producer rates on the traditional cost-of-service basis.[23] The Commission settled on a higher price as an incentive to exploration and development, and vintaging as the means of limiting the higher price to activity of that character.[24] So it was that vintaging became a standard feature of gas-rate orders for years to come.
 
 
 44
 In its Permian Basin order, the Commission adopted two maximum area prices, differentiated by a date approximating the time at which programs specifically directed toward exploration for and development of new sources of natural gas became widely possible.[25] One price, the higher of the two, established the ceiling for "new" gas-well gas gas produced independently of oil[26] and dedicated to the interstate market after the division date.[27] The "new" price was calculated from data reflecting the costs of finding and producing gas-well gas in the years prior to the division date.[28] The lower price setting the level for "old" gas all other gas, including that produced from fields already in operation was derived from historical costs of producing gas-well gas in the area.[29]
 
 
 45
 Thus "(t)he Commission's use of separate sources of data for the two rates permitted the creation of a price differential between them without the inclusion of non-cost components."[30] The Permian Basin order incorporated the Commission's specific finding that vintaging "holds out a reward to encourage producers to engage in further exploration and development while preventing excess and unnecessary revenues from the sale of gas developed at a period when there was no special exploratory activity directed to gas discovery."[31] In accepting unqualifiedly the concept of vintaging, the Supreme Court adverted particularly to the Commission's finding, "on the basis of substantial evidence, that a two-price rate structure will both provide a useful incentive to exploration and prevent excessive producer profits."[32] The Court noted, too, the Commission's reasoning "that excessive producer profits could be minimized only if the rate for flowing gas were derived from the most precise available evidence of actual historical costs,"[33] and that the price fixed for "old" gas was relatively low "since price could not serve as an incentive, and since any price above average historical costs, plus an appropriate return, would merely confer windfalls."[34]
 
 
 46
 This multiple-price methodology "vintaging" has been a common element of rate design in a lengthy series of area ratemaking orders since the one promulgated for the Permian Basin in 1965.[35] As 1972 drew to a close, it was so commonplace and prominent in area ratemaking that the Commission itself acknowledged that "vintaging by contract date has become a hallmark of the area rate structure. . . ."[36] In the same breath, however, the Commission declared that vintaging is "an anachronism which we should now move to eliminate,"[37] and announced that thereafter, as an incentive to full exploration of the productive capability of gas fields in operation, "old" gas might be priced as "new" gas upon expiration of existing contracts of sale.[38] The orders presently under review undertake to carry that policy out to its full limit.
 
 
 47
 In Nos. 73-1647 and 73-1793, the orders authorize the three producer-applicants to incorporate the higher "new" rate in contracts executed after expiration of older contracts covering sales from the same sources of supply.[39] In No. 73-1794, the orders permit Mobil to substitute Texas Eastern for Shell as the immediate purchaser, at the "new" rate, of "old" gas taken from the same field from which Shell was supplied.[40] In each instance, flowing gas developed at cheaper costs can now be sold at the higher rate, without any effort whatever to find or dedicate new gas-well gas to the interstate community.
 
 
 48
 This, I repeat, is wholly in line with the Commission's declaration in Opinion No. 639 of the policy allowing newly executed contracts to be treated as "new" gas contracts under the area rate structure, even though such contracts serve merely to continue gas sales commenced during earlier periods to which the "old"-gas price ceiling for the area was applicable.[41] The ultimate consequence of permitting "new"-rate contracts to supplant existing "old"-rate contracts becomes apparent when it is recalled that eventually all time-limited "old" gas-sale contracts will run their course and new contracts at the "new" rate will inevitably follow. Vintaging will thus disappear step by step; as the Commission acknowledges, "(i)n time this (technique) will result in the elimination of a two-price system."[42]
 
 
 49
 As ground for this approach, the Commission has offered only a brief explanation:
 
 
 50
 Vintaging operates to discourage development of the full productive capacity of acreage committed to the interstate market, for even though such developmental drilling is undertaken at current costs, gas production obtained thereby is priced at the lower of two rates, when it is the higher of the two that is Commission-designed to provide the incentive for development of additional gas supplies.[43]
 
 
 51
 That, in my view, is legally inadequate as a predicate for the Commission's action.[44] I submit that the orders in question lack sufficient supporting evidence[45] and fail to reflect the reasoned consideration due,[46] and accordingly are beyond the Commission's authority.[47]
 
 
 52
 Until the Commission forsook vintaging, it had functioned as the only process by which situations wherein exploratory and developmental ventures were likely the "new" gas situations were broadly differentiated, in terms of incentive components of a rate, from those wherein there was little or no such likelihood. I do not say that the Commission cannot under any conditions phase out or abandon price-vintaging as a regulatory mechanism; only recently we observed that "(w)ithin the limits imposed by the requirement of reasoned decision-making, the Commission is free to modify or even reverse its established policy."[48] I do say that when, as here, the Commission allows "old" gas to command the higher "new" gas price in the name of incentive, its action must be suitably justified.
 
 
 53
 There is obviously a sharp inherent difference between "old" and "new" gas in terms of the probability that a price increase indiscriminately applicable to all gas will stimulate either exploration or development.[49] For "new" gas the latter are a must; without a fresh gas find brought into production, the higher price is never realized. But for gas already flowing, no effort beyond the simple step of charging the higher price is required, and the incentive scheme achieves its objective only if the price increase attracts the activity needed to enlarge the supply of "new" gas. Since, to the extent that the scheme fails, the inevitable result is an excessive rate providing windfalls for producers, I believe it legally incumbent upon the Commission to find, on the basis of both evidence and logic, a reasonable probability that the scheme will succeed. I am unable to perceive either predicate in these cases.
 
 II
 
 54
 Factual determinations by the Commission, I reiterate, must be supported by substantial evidence.[50] That requirement springs from the very legislation empowering the Commission to regulate interstate transactions in natural gas.[51] As we have observed in the past, "(i)t is highly significant that this substantial evidence test is a part of the actual language of the Natural Gas Act,"[52] for "(t)his indicates that Congress was particularly concerned with the degree of certainty required in establishing factual predicates in rate-making."[53] I am unable to discern any appreciable degree of evidentiary certainty underlying the orders contested here.
 
 
 55
 The one justifying consideration articulated by the Commission at all relevant to its action in these cases is the need to spur "development of the full productive capacity of acreage committed to the interstate market."[54] The one obstacle identified by the Commission is that only the "new" price for gas already flowing from that acreage will provide sufficient incentive to do so.[55] An elementary difficulty, however, is that the records before us are devoid of any evidence tending to show that allocation of the "new" price for what in reality is "old" gas is likely to achieve the Commission's stated objective.
 
 
 56
 In the Permian Basin Area Rate Cases,[56] the seminal authority for incentives in rate orders, the Court sustained the two-tiered pricing scheme there involved because the Commission had found, "on the basis of substantial evidence, that a two-price rate structure will both provide a useful incentive to exploration and prevent excessive producer profits."[57] The "new" gas price had been carefully constructed on data reflecting current costs of finding and developing new gas-well gas, and that price in turn was the stimulus which the Commission had sought.[58] "The inducement to be found in the 'new' gas price" was "of an inherent nature,"[59] the Commission had said; "(t)he incentive" was "built into the two-price system;"[60] and what had emanated was "a price for the future related to current and future costs and payable only to producers who discover gas-well gas and dedicate their discoveries to the interstate market."[61] But now, as gas contracts expire, the Commission would obliterate the price variation predicated on vintaging, and with it the built-in incentive furnished by the fact that the higher price was available only as a reward for renewed exploratory and developmental effort.
 
 
 57
 Beyond cavil, extension of the "new" area rate to successor contracts covering still-flowing "old" gas is totally without evidence specifically underpinning the Commission's premise that the move presages fuller development of acreage producing beneath its potential. Neither the Commission nor any of the intervenors is able to point to any evidence of that type,[62] either in the proceeding leading to Opinion No. 639 or in the records before us.[63] The orders under review plainly proceed on the notion that Opinion No. 639's interpretation of vintaging orders a nonevidentiary adjudication[64] furnishes an ample predicate, and that no more is necessary.[65]
 
 
 58
 Surely, unlike the two-price feature comprising area-rate vintaging,[66] permission to charge the "new" rate for "old" gas does not readily suggest increased exploration and development as probable results.[67] When the higher price is obtainable only for gas that is truly "new,"[68] an inducement to enlarge the supply may become fairly evident. The nexus between the price and the inducement may appear simply as a matter of ordinary human experience; as the authorized price for jurisdictional gas goes up, so may also the inducement to sell gas in the interstate market. Producers of natural gas are in business to make money, and a price high enough, if limited to gas really "new," is well calculated to attract efforts to locate undiscovered reserves, to develop virgin deposits and to put undedicated gas into interstate pipelines.
 
 
 59
 The same cannot be said nearly as confidently for allowance of the higher "new" price for gas from a field already known, producing and committed to interstate distribution. Under the plan projected by Opinion No. 639, the "new" price is not restricted to gas produced from new wells developed in that field; rather, all gas from the field would command the "new" price, including gas discovered, developed and dedicated long ago. Like the Fifth Circuit, the most I can say is that it is merely "conceivable" that the expectations of Opinion No. 639 will become a reality;[69] like my colleagues, I cannot say with any degree of assurance that it actually will.[70] In this milieu, there is, at least for me, a call for evidence resolving affirmatively the critical question whether the Commission's policy of pricing "old" gas at the "new" rate is promising enough as an incentive to survive the test of reasonableness.[71]
 
 
 60
 I am mindful, of course, of the natural gas shortage now plaguing the Nation, and of the vigilant and serious consideration the Commission must give it in its regulatory activities.[72] In recent times, we have reviewed a number of Commission orders designed to instigate additional exploration and development by the natural gas industry,[73] and unfailingly have given prominence to the scarcity of gas and the need to provide incentives of that type.[74] But we have also been sensitive to our statutory responsibility[75] to make certain that there is substantial evidence in the record as a whole to sustain the particular incentive scheme under review.[76] And while we have "recognize(d) that agency expertise is to be accorded deference,"[77] we have taken pains to deny that this "principle() can substitute for the adequate evidentiary basis upon which the Commission's finding(s) must rest."[78] In the case at bar, there simply is no evidence as to whether the questioned orders will, as a matter of reasonable prospect, lead to an alleviation of the shortage.[79]
 
 
 61
 I do not gainsay the need to accord the Commission wide latitude in its efforts to find ways and means of combating the gas deficiency.[80] A "broad discretion . . . has been entrusted to the Commission," we have said, " 'to devise methods of (natural gas) regulation capable of equitably reconciling diverse and conflicting interests,' and (the Commission's) discretion must be given particular respect 'in this time of acute energy shortage.' "[81] But we have also said that "the purposes of the Natural Gas Act, including that of protecting consumers from prices which are forced above a just and reasonable level by the market power of natural gas suppliers, impose limits on this discretion."[82] As the Supreme Court has declared, "(t)he Commission (is) bound to exercise its discretion within the limits of the standards expressed by the Act; and 'for the courts to determine whether the agency has done so, it must "disclose the basis of its order" and "give clear indication that it has exercised the discretion with which Congress has empowered it." ' "[83] In my view, the basis thus far revealed by the Commission is inadequate to bring its action within the confines of its statutory authority.
 
 
 62
 The conclusion my colleagues reach in these cases is not sustained by the Fifth Circuit's decision in Shell Oil Company v. Federal Power Commission,[84] upon which they rely; indeed, it is antithetical to the holding in Shell. There the court reviewed, not concrete applications of Opinion No. 639 as here, but the opinion the interpretative rule itself. Thus for good reason the court deemed the appropriate inquiry to be simply whether that opinion's interpretation of the Commission's vintaging regulations, a matter commanding judicial deference,[85] was "reasonable and consistent with the regulation(s)."[86] While recognizing the possibility that the interpretation Opinion No. 639 yielded may not lead to a larger gas supply,[87] the court noted that "(i)t is also conceivable . . . that a departure from vintaging will serve to increase gas production,"[88] and on that basis concluded that the Commission's "interpretation of its regulations' vintaging provision is rational, reasonable, and therefore fully permissible."[89] But the court was careful to state that
 
 
 63
 (a) caveat is appropriate at this point. In regard to vintaging, today we are approving (the Commission's) interpretation of certain regulations. We do not reach the question of whether (the Commission) may altogether discontinue the use of vintaging. Rather in each future rate order the Commission must continue to produce substantial evidence to support each essential element of the proposed rate structure. . . . Certainly the absence or presence of vintaging must be regarded as an essential element.[90]
 
 
 64
 In the cases at bar, we are summoned to examine the interpretative rule, not in the sterile context of a rulemaking review, but in operation in rate orders addressing concrete situations. The orders are clearly of the type which Shell referred to in its call for substantial evidence to support the absence of a vintaging component from their rate structures.[91] I agree with the Fifth Circuit that that absence is an essential element of the orders, and as such depended on an ample evidentiary foundation for survival.[92] The majority position here, in treating supporting evidence as an unnecessary commodity, not only disregards Shell's specific ruling on the point but, more fundamentally, also ignores the Supreme Court's mandate on that score.[93]
 
 III
 
 65
 Beyond advertence to the need for supporting evidence, this court has consistently enforced the Supreme Court's mandate[94] that the Commission give "reasoned consideration" to each and every factor pertinent to its decision.[95] As we have had occasion to state, "(r)espect for the broad discretion of the (Commission) and appreciation of its difficult regulatory task impel us to uphold the Commission when it perceives the central problems, diligently seeks information to assist it in resolving those issues, and exercises its best judgment in the light of that information."[96] But as we have also made clear, "in applying the 'substantial evidence test . . . reasoned conclusions are the hallmark of regularity,' "[97] and "the reviewing court's duty to 'assure fidelity to the functions assigned to the regulatory agency by Congress' requires that it hold the agency to its duty to give reasoned consideration to the facts and issues material to its determinations."[98] I think the Commission should be bound to that duty here.
 
 
 66
 The reasoned-consideration requirement obtains with respect to incentive features of the Commission's rate orders as much as it does to any other.[99] To be sure, "an inability to 'determine the precise amount of additional gas supply that would be found and dedicated to interstate sales' as a result of the incentive formula" is not necessarily fatal to the order.[100] And certainly "(c)ourts 'cannot fairly demand the perfect at the expense of the achievable' and ought not insist on findings which are 'unrealistically and unnecessarily refined.' "[101] But "problems which preclude precise quantification do not excuse the Commission's abdication of its duty to indicate 'fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as the consequences of its orders for the character and future development of the industry.' "[102] That, I say, the Commission has not done here.[103]
 
 
 67
 More specifically, the Commission has not shown that it gave " 'reasoned consideration' to the shaping of its order(s) in an effort to protect consumers from paying substantially more than necessary to bring forth the needed supplies."[104] "The purpose of the Natural Gas Act," we all know, "was to underwrite just and reasonable rates to the consumers of natural gas;"[105] its "primary aim . . . was to protect consumers against exploitation at the hands of natural gas companies."[106] In harmony with that goal, "(t)he Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges."[107] On the administrative records in these cases as they now stand, we cannot discharge the responsibility of a reviewing court to determine whether the orders in question can rationally be expected to "provide appropriate protection to the relevant public interests, both existing and foreseeable."[108]
 
 
 68
 The challenged orders confer upon the producers the privilege of charging the higher "new" rate for gas from old wells brought to maturity during an era when the expense of exploration and development was much lower than it is today. The Commission's sole justification for this boon is the asserted need for an incentive to development of acreage in production to its maximum potential.[109] In no wise, however, do these orders provide any assurance that the new revenues thus generated will be devoted to that end. Had the orders conditioned receipt of the additional revenues on expenditures calculated to enlarge the productive capability of existing fields, the problem under discussion would hardly have arisen.[110] Nonetheless, the Commission, without any explanation whatsoever, has not imposed any such limitation upon its grant.
 
 
 69
 This is not the first time we have encountered this type of difficulty in the Commission's rate-increase orders. In Macdonald v. Federal Power Commission,[111] an independent producer's sales were approved at rates far above those established by the applicable area rate order, and the Commission sought to justify the rate raise by the producer's commitment to invest funds in further gas exploration and production. It appeared, however, that the additional revenues would greatly exceed the amount of the commitment, and in substantial part might be directed toward finds of gas or oil that would never reach the interstate market. We were "troubled by the Commission's failure to require (the producer) to invest in exploration for gas to be dedicated to the interstate market all of its . . . revenues in excess of those it would have obtained at the area rate."[112] We expressed our feeling that "(a) requirement that all the excess revenues be employed to ease the interstate gas shortage would have given symmetry to the purpose of the grant of relief and (the producer's) quid pro quo to obtain the relief."[113] We pointed out that "(t)he symmetry would have been perfected had the Commission given preemptive rights on the gas obtained from the exploration to (the pipeline) whose rate-paying consumers effectively funded the new drilling."[114] It was unnecessary to consider whether this deficiency demanded redress since for other reasons a remand to the Commission was required.[115]
 
 
 70
 Here, even more than in Macdonald, there is a lack of assurance that the producers' added revenues will ever mean added gas supplies for the interstate community.[116] For there is no commitment of any sort by the producers, nor any requirement whatever by the Commission; there is, in other words, not so much as an understanding that any of the new funds will be invested in new wells in existing fields, or that any "new" gas therefrom will be directed to the interstate market. There is, moreover, no record evidence indicating a probability that attainment of those goals will automatically follow.[117] I believe that here there should be "a much tighter fit between (the producers') quid pro quo and the purposes for which the Commission acted,"[118] and that the Commission should be required to provide it.[119]
 
 IV
 
 71
 True it is that "(a) presumption of validity . . . attaches to each exercise of the Commission's expertise," and that "those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' "[120] In my view, however, petitioners have demonstrated glaring deficiencies in the challenged orders which may well indulge them precisely that effect. In vital aspects they lack substantial supporting evidence in the administrative records[121] and reasoned consideration in the Commission's adjudicative exercises,[122] each contributing to a potentially unlawful result. That result is an excessive rate for "old" gas from fields already in production, made possible by a complete lack of assurance, evidentiary or otherwise, that the excess of the "new"-gas rate over the "old"-gas rate will be channeled into a quest for additional gas supplies. Exorbitant rates are unjust and unreasonable rates,[123] beyond the authority of the Commission to prescribe.[124]
 
 
 72
 The Commission is "obliged at each step of its regulatory process to assess the requirements of the broad public interests entrusted to its protection by Congress."[125] This the Commission has not done, and I am unable to join in affirmance of the orders under review as they now stand. I would remand these cases to the Commission for further investigation of the critical issues which have not as yet been adequately addressed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)
 
 
 [1]
 Area Rates for Appalachian and Illinois Basin Areas, 48 FPC 1299 (1972), reh. denied, 49 FPC 361 (1973), aff'd sub nom., Shell Oil Co. v. F.P.C., 491 F.2d 82 (5th Cir. 1974)
 
 
 [2]
 Area Rate Proceeding (Texas Gulf Coast Area), 45 FPC 674, reh. denied, 46 FPC 826 (1971)
 
 
 [3]
 49 FPC 1009, reh. denied, 49 FPC 1411 (1973)
 
 
 [4]
 We decline the invitation to treat Shell as binding under the doctrine of res judicata or collateral estoppel. The parties here are not identical to or in privity with those in Shell. Nor are the causes of action identical. They arise from different contracts and different Commission orders. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). We note, however, that petitioners here were intervening parties in Shell and that much of petitioners' expanded argument here was absent from the proceedings below on the orders herein appealed and from the presentations made in Shell
 
 
 [1]
 "First, (the reviewing court) must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), 390 U.S. 747, 791-792, 88 S.Ct. 1344, 1372-1373, 20 L.Ed.2d 312, 350 (1968). See also Mobil Oil Corp. v. FPC, 417 U.S. 283, 307-308, 94 S.Ct. 2328, 2345-2346, 41 L.Ed.2d 72, 95 (1974); Public Serv. Comm'n v. FPC, 167 U.S.App.D.C. 100, 107, 511 F.2d 338, 345 (1975); Macdonald v. FPC, 164 U.S.App.D.C. 248, 255-256, 505 F.2d 355, 362-363 (1974); Memphis Light, Gas & Water Div. v. FPC, 164 U.S.App.D.C. 156, 161, 504 F.2d 225, 230 (1974)
 
 
 [2]
 See note 1 supra
 
 
 [3]
 See note 1 supra
 
 
 [4]
 See note 1 supra
 
 
 [5]
 Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 309-310, 94 S.Ct. at 2346, 41 L.Ed.2d at 95-96. See also Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 766, 88 S.Ct. at 1359, 20 L.Ed.2d at 335-336; Cities of Fulton v. FPC, 168 U.S.App.D.C. 33, 37, 512 F.2d 947, 951 (1975); Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 107, 511 F.2d at 345; Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 256, 505 F.2d at 363
 
 
 [6]
 E. g., Arkansas Power & Light Co. v. FPC, 170 U.S.App.D.C. 393, 406-407, 517 F.2d 1223, 1236-1237 (1975); Moss v. FPC, 164 U.S.App.D.C. 1, 11-12, 502 F.2d 461, 471-472 (1974), cert. granted, 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 668, cert. denied, 422 U.S. 1020, 95 S.Ct. 2642, 45 L.Ed.2d 680 (1975)
 
 
 [7]
 E. g., Arkansas Power & Light Co. v. FPC, supra note 6, 170 U.S.App.D.C. at 402-406, 517 F.2d at 1232-1236; Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 255-258, 505 F.2d at 362-365; Memphis Light, Gas & Water Div. v. FPC, supra note 1, 164 U.S.App.D.C. at 162-167, 504 F.2d at 231-236
 
 
 [8]
 E. g., Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 108-117, 511 F.2d at 346-355; Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 255-258, 505 F.2d at 362-365
 
 
 [9]
 Act of June 21, 1938, ch. 556, 52 Stat. 821, as amended, 15 U.S.C. §§ 717 et seq. (1970)
 
 
 [10]
 Natural Gas Act § 4(a), 15 U.S.C. § 717c(a) (1970)
 
 
 [11]
 Id
 
 
 [12]
 FPC v. Texaco, Inc., 417 U.S. 380, 394, 94 S.Ct. 2315, 2324-2325, 41 L.Ed.2d 141, 154 (1974); Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 676-685, 74 S.Ct. 794, 795-801, 98 L.Ed. 1035, 1044-1049 (1954)
 
 
 [13]
 See note 1 supra
 
 
 [14]
 Part II infra
 
 
 [15]
 Part III infra
 
 
 [16]
 See text infra at notes 123-124
 
 
 [17]
 Atlantic Ref. Co. v. Public Serv. Comm'n, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312, 1319 (1959), quoting original § 7(c) of the Act, 52 Stat. 825 (1938), which, though later eliminated, remains a fundamental purpose. 360 U.S. at 388 n.7, 79 S.Ct. at 1253 n.7, 3 L.Ed.2d at 1319 n.7
 
 
 [18]
 FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 742-743, 86 L.Ed. 1037, 1049 (1942)
 
 
 [19]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 797, 88 S.Ct. at 1375-1376, 20 L.Ed.2d at 353
 
 
 [20]
 Id. at 798, 88 S.Ct. at 1376, 20 L.Ed.2d at 353-354
 
 
 [21]
 Id. at 796, 88 S.Ct. at 1375, 20 L.Ed.2d at 352. See also FPC v. Texaco, Inc., supra note 12, 417 U.S. at 388-390, 94 S.Ct. at 2321-2323, 41 L.Ed.2d at 151-152; Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 316-320, 94 S.Ct. at 2349-2352, 41 L.Ed.2d at 99-102
 
 
 [22]
 Permian Basin Area Rate Proceeding, (Opinion No. 468), 34 F.P.C. 159 (1965), rehearing denied (Opinion No. 468-A), 34 F.P.C. 1068 (1965), remanded sub nom. Skelly Oil Co. v. FPC, 375 F.2d 6 (10th Cir. 1967), on rehearing, 375 F.2d 35 (1967), rev'd in part sub nom. Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1
 
 
 [23]
 For judicial discussions of the shift from individual to area ratemaking for the natural gas industry, see Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 755-765, 88 S.Ct. at 1353-1359, 20 L.Ed.2d at 329-334; Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 301-306, 94 S.Ct. at 2342-2345, 41 L.Ed.2d at 91-94; FPC v. Texaco, Inc., supra note 12, 417 U.S. at 387-389, 94 S.Ct. at 2321-2322, 41 L.Ed.2d at 150-152. See also Phillips Petroleum Co. (Opinion No. 388), 24 F.P.C. 537 (1960), rehearing denied, 24 F.P.C. 1008 (1960), aff'd sub nom. Wisconsin v. FPC, 112 U.S.App.D.C. 369, 303 F.2d 380 (1961), aff'd, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); Statement of General Policy No. 61-1, 24 F.P.C. 818 (1960)
 
 
 [24]
 Permian Basin Area Rate Proceeding (Opinion No. 468), supra note 22, 34 F.P.C. at 185-189
 
 
 [25]
 The genesis of the two-tier pricing system in area ratemaking has been described by the Supreme Court as follows:
 (T)he Commission concluded that price could usefully serve as an incentive to exploration and production only if it were computed according to the method by which gas is produced. Natural gas produced jointly with oil is necessarily, a relatively unimportant by-product. The value of oil-well gas is on average only one-seventeenth that of the oil with which it is produced. See 34 F.P.C. at 322. It cannot be separately sought or independently produced; its production is effectively restricted by state regulations intended to encourage the conservation of oil. Accordingly, the supply of oil-well gas is, as the examiner observed, "almost perfectly inelastic." Id., at 323.
 On the other hand, gas-well gas is produced independently of oil, and of state restrictions on oil production. More important, the Commission found that a separate search can now be conducted for gas reservoirs; cumulative drilling experience permits at least the larger producers to direct their programs of exploration and development to the search for gas. The supply of gas-well gas is therefore relatively elastic, and its price can meaningfully be employed by the Commission to encourage exploration and production. The Commission reasoned that a higher maximum rate for gas-well gas dedicated to interstate commerce after the approximate moment at which a separate search became widely possible would provide an effective incentive. Correspondingly, the Commission adopted a relatively low price for all other natural gas produced in the Permian Basin, since price could not serve as an incentive, and since any price above average historical costs, plus an appropriate return, would merely confer windfalls.
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 796-797, 80 S.Ct. at 1375-1376, 20 L.Ed.2d at 352-353 (footnotes omitted).
 
 
 [26]
 See note 25 supra
 
 
 [27]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 759-760, 88 S.Ct. at 1355-1356, 20 L.Ed.2d at 332. The division date was January 1, 1961. Id
 
 
 [28]
 Id. at 800-801, 88 S.Ct. at 1377-1378, 20 L.Ed.2d at 355-356
 
 
 [29]
 Id. at 801-802, 88 S.Ct. at 1377-1378, 20 L.Ed.2d at 356
 
 
 [30]
 Id. at 803, 88 S.Ct. at 1378-1379, 20 L.Ed.2d at 1356-1357. The Commission "computed the two area maximum prices directly from costs of service, without allowances for noncost factors"; its price differential was "the product of differences in the time periods and geographical areas for which costs were computed, and not of noncost additives to cost components." Id. at 799-800, 88 S.Ct. at 1376-1377, 20 L.Ed.2d at 354-355. See, however, id. at 814-815 & n.98, 88 S.Ct. at 1384-1385 & n.98, 20 L.Ed.2d at 363 & n.98. It is, of course, now clear that the Commission may properly include, within a zone of reasonableness, noncost incentives to exploration, development and production of new sources of natural gas. E. g., Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 316-321, 94 S.Ct. at 2349-2352, 20 L.Ed.2d at 99-102; Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 796-798, 815 & n.98, 88 S.Ct. at 1375-1376, 1384-1385 & n.98, 20 L.Ed.2d at 352-354, 363 & n.98
 
 
 [31]
 Permian Basin Area Rate Proceeding (Opinion No. 468), supra note 22, 34 F.P.C. at 186
 
 
 [32]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 798, 88 S.Ct. at 1376, 20 L.Ed.2d at 354. See also FPC v. Texaco, Inc., supra note 12, 417 U.S. at 388-390, 94 S.Ct. at 2321-2323, 41 L.Ed. at 151-152
 
 
 [33]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 802, 88 S.Ct. at 1378, 20 L.Ed.2d at 356
 
 
 [34]
 Id. at 797, 88 S.Ct. at 1375-1376, 20 L.Ed.2d at 353
 
 
 [35]
 Permian Basin Area Rate Proceeding (Opinion No. 468), supra note 22, 34 F.P.C. at 185-189, 207-220, 239, new rates established, Permian Basin Area Rate Proceeding (Opinion No. 662), 50 F.P.C. 390 (1973), modified on rehearing, (Opinion No. 662-A), 50 F.P.C. 932 (1973); Southern Louisiana Area Rate Proceeding (Opinion No. 546), 40 F.P.C. 530, 544, 636-648 (1968), modified on rehearing (Opinion No. 546-A), 41 F.P.C. 301 (1969), aff'd sub nom. Southern Louisiana Area Rate Cases (Austral Oil Co. v. FPC), 428 F.2d 407 (5th Cir. 1970), on rehearing, 444 F.2d 125 (5th Cir. 1970), cert. denied, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970), new rates established, Southern Louisiana Area Rate Proceeding (Opinion No. 598), 46 F.P.C. 86, 105, 134-139, 142-143 (1971), clarified on rehearing (Opinion No. 598-A), 46 F.P.C. 633 (1971), aff'd sub nom. Placid Oil Co. v. FPC, 483 F.2d 880 (5th Cir. 1973), aff'd sub nom. Mobil Oil Corp. v. FPC, supra note 1; Hugoton-Anadarko Area Rate Proceeding (Opinion No. 586), 44 F.P.C. 761, 772-776, 786-787 (1970), aff'd sub nom. In re Hugoton-Anadarko Area Rate Case (California v. FPC), 466 F.2d 974 (9th Cir. 1972); Appalachian-Illinois Basin Area Rate Proceeding (Opinion No. 411), 44 F.P.C. 1112, 1121-1125, 1130 (1970), modified (Opinion No. 411-A), 44 F.P.C. 1334 (1970), rehearing denied (Opinion No. 411-B), 44 F.P.C. 1487 (1970), establishment of new area rates declined, Appalachian-Illinois Basin Area Rate Proceeding (Opinion No. 639), 48 F.P.C. 1299 (1972), aff'd sub nom. Shell Oil Co. v. FPC, 491 F.2d 82 (5th Cir. 1974); Texas Gulf Coast Area Rate Proceeding (Opinion No. 595), 45 F.P.C. 674, 705-709 (1971), modified on rehearing (Opinion 595-A), 46 F.P.C. 827 (1971), vacated and remanded sub nom. Public Serv. Comm'n v. FPC, 159 U.S.App.D.C. 172, 487 F.2d 1043 (1973), vacated and remanded sub nom. Shell Oil Co. v. FPC, 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974), on remand sub nom. Public Serv. Comm'n v. FPC, 170 U.S.App.D.C. 153, 516 F.2d 746 (1975); Other Southwest Area Rate Proceedings (Opinion No. 607), 46 F.P.C. 900, 909, 913-919, 923-924 (1971), modified on rehearing (Opinion No. 607-A), 47 F.P.C. 99 (1971), aff'd sub nom. In re Other Southwest Area Rate Cases (Shell Oil Co. v. FPC), 484 F.2d 469 (5th Cir. 1973), cert. denied, 417 U.S. 973, 94 S.Ct. 3180, 41 L.Ed.2d 1144 (1974). See also Rocky Mountain Area Rate Proceeding (Opinion No. 658), 49 F.P.C. 924, 942-944, 947-948, 949-950 (1973), rehearing denied, 49 F.P.C. 1279 (1973)
 
 
 [36]
 Appalachian-Illinois Area Rate Proceeding (Opinion No. 639), supra note 35, 48 F.P.C. at 1309
 
 
 [37]
 Id
 
 
 [38]
 Id. at 1309-1310
 
 
 [39]
 The Commission approved the rate increases on the basis of the interpretations announced in Opinion No. 639, that "the new gas ceilings established under previous area rate opinions should apply to sales of natural gas made pursuant to 'new' contracts in those situations where deliveries of gas were previously certificated and dedicated to the interstate market under 'old' contracts which have expired by their own terms." Continental Oil Co., --- F.P.C. ---, --- (1973) (order accepting rate filings) (J.App. 24)
 
 
 [40]
 Mobil had sold gas to Shell, which in turn had gathered, processed and resold the gas to Texas Eastern. The orders in question authorized Mobil to abandon further sales to Shell under the expired Mobil-Shell contract and to sell the same gas directly to Texas Eastern at the "new" price. The service by Mobil appears to be merely a continuation of deliveries commenced during the "old"-rate era, and despite elimination of Shell's "middle man" status, Shell would continue to provide the same processing and delivery services as before. Mobil Oil Corp., 49 F.P.C. 1009-1010 (1973) (order approving abandonment)
 
 
 [41]
 Appalachian-Illinois Basin Area Rate Proceeding (Opinion No. 639), supra note 35, 48 F.P.C. at 1309-1310
 
 
 [42]
 Id. at 1310
 
 
 [43]
 Id. at 1309. Four months later, the Commission spoke again to the demise of the vintaging concept, echoing essentially the same theme:
 Whatever the merits of contract vintaging when adopted, we do not believe this concept responds to the present need for increased exploration and development. Exploration and development undertaken at current cost levels is retarded if the risk-taken knows that any gas found will be priced on the basis of historic, noncurrent costs. Similarly, the incentive factors applied in "new" gas ratemaking are totally lost as to undeveloped acreage committed under old contracts.
 Rates based on historic costs should apply to that gas brought to market at the historic cost levels relied upon in setting the rates. . . .
 Rocky Mountain Area Rate Proceeding (Opinion No. 658), supra note 35, 49 F.P.C. at 943.
 In the proceedings under review, the Commission did not offer any additional rationale; it simply accepted Opinion No. 639 as the controlling precedent. In the order under review in Nos. 73-1647 and 73-1793, the Commission ruled:
 In Opinion No. 639 we concluded that the new gas ceilings established under previous area rate opinions should apply to sales of natural gas made pursuant to "new" contracts in those situations where deliveries of gas were previously certificated and dedicated to the interstate market under "old" contracts which have expired by their own terms. That conclusion was based on our determination to interpret literally the vintaging provisions contained in area rate opinions.
 In the present cases each producer has entered into a new contract and his old contract has expired. Accordingly, under our interpretation of area rate opinions in Opinion No. 639, each of the subject increases to the new gas ceiling is acceptable.
 Continental Oil Co., supra note 39, --- F.P.C. at --- (J.App.24). In the order denying rehearing of the order under review in No. 73-1794, the Commission declared that the allegations seeking rehearing
 appear to be primarily a collateral attack on (Opinion No. 639), which modifies our vintage pricing concept by allowing producers to collect "new gas rates" where an old contract expires by its own terms and a new contract is negotiated. . . . No further discussion of this issue is needed in this proceeding.
 Mobil Oil Corp., supra note 43, 49 F.P.C. at 1412 (order denying rehearing).
 
 
 [44]
 It is settled, of course, that the "order(s) must be upheld, if at all, 'on the same basis articulated in the order(s) by the agency itself.' " FPC v. Texaco, Inc., supra note 12, 417 U.S. at 397, 94 S.Ct. at 2326, 41 L.Ed.2d at 156, quoting Burlington Truck Lines v. United States, 371 U.S. 156, 169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216 (1962). See also SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947)
 
 
 [45]
 Part II infra
 
 
 [46]
 Part III infra
 
 
 [47]
 See text infra at notes 123-124
 
 
 [48]
 Consolidated Gas Supply Corp. v. FPC, 172 U.S.App.D.C. ----, 520 F.2d 1176, at 1185 (1975) (footnotes omitted)
 
 
 [49]
 I do not suggest that the lower rates may not under proper conditions include a noncost factor representing a share of the financial burden of exploration for and development of sources of "new" gas. See text infra at note 79
 
 
 [50]
 See cases cited supra note 7 and infra this Part II
 
 
 [51]
 Natural Gas Act § 19(b), 15 U.S.C. § 717r(b) (1970)
 
 
 [52]
 Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 254-255 n.68, 483 F.2d 1238, 1257-1258 n.68 (1973)
 
 
 [53]
 Id
 
 
 [54]
 See text supra at note 43
 
 
 [55]
 See text supra at note 43
 
 
 [56]
 (Continental Oil Co. v. FPC), supra note 1
 
 
 [57]
 390 U.S. at 798, 88 S.Ct. at 1376, 20 L.Ed.2d at 353-354
 
 
 [58]
 See text supra at notes 25-34 and notes 25, 30 supra
 
 
 [59]
 Permian Basin Area Rate Proceeding (Opinion No. 468), supra note 22, 34 F.P.C. at 186
 
 
 [60]
 Id
 
 
 [61]
 Id
 
 
 [62]
 At oral argument we invited memoranda by the parties identifying and discussing the evidentiary bases, if any, for the orders now under review. I am unable to find in the submissions responsive to that invitation any reference to evidence bearing directly on the question whether allowance of the "new"-gas rate for "old" gas in replacement-contract situations, without more, is really calculated to bring about maximum development of existing fields and additional gas for the interstate community. That question is not answered affirmatively by evidence, in the proceeding generating Opinion No. 639, merely to the effect that price-vintaging has failed to achieve that goal, for it does not establish ipso facto a reasonable likelihood that the new pricing formula will succeed. Nor is the gap filled by testimony, in area rate proceedings antedating Opinion No. 639, which advocated abolition of all vintaging, for nothing in Opinion No. 639 indicates that the Commission accepted or how it might have accepted such testimony for that purpose. See notes 64, 90 infra
 
 
 [63]
 The findings to which the majority opinion refers relate only to the portion of Opinion No. 639 refusing to establish a new third-vintage gas price in the Appalachian-Illinois Basin. See notes 64, 90 infra. Nowhere in Opinion No. 639 does the Commission undertake to elucidate a connection between its repricing policy and a beneficial effect on gas supply for the interstate market. My colleagues candidly acknowledge uncertainty that additional revenues from sales of flowing gas will lead to increased development or production, and for all we know the prospect may be forlorn
 Moreover, my colleagues' observation that the justness and reasonableness of preexisting area rates was determined in the respective proceedings leading to the orders setting those rates seems to me to be wide of the mark. Those rates were formulated on the basis of vintaging. See note 35 supra and accompanying text. My thesis is that rates which are just and reasonable when vintaged are not necessarily just and reasonable when vintaging is eliminated.
 
 
 [64]
 The portion of Opinion No. 639 relevant to the instant cases emanated from a suggestion that a new third-vintage gas price be established in the Appalachian-Illinois Basin. The Commission denied that request. Appalachian-Illinois Basin Area Rate Proceeding (Opinion No. 639), supra note 35, 48 F.P.C. at 1306-1309. The Commission then, however, proceeded to address the two-price rate-vintaging aspect of the existing area rate order, and held that vintaging should be eliminated. Id. at 1309-1310. See also text supra at note 43. The mechanism by which the Commission accomplished this modification of rate design was its "interpretation" of the area-rate order vintaging provisions that when current contracts dedicating gas to the interstate market expire and new contracts are made, sales thereunder will be priced at the "new"-gas price ceiling. Id. at 1310. See also note 90 infra
 
 
 [65]
 Both orders under review accept Opinion No. 639 as an adequate foundation. See note 43 supra
 
 
 [66]
 See text supra at notes 22-35
 
 
 [67]
 See text supra at note 49
 
 
 [68]
 See text supra at notes 26-27
 
 
 [69]
 See text infra at notes 84-90
 
 
 [70]
 See note 63 supra
 
 
 [71]
 See text supra at notes 10-11 and infra at notes 105-107
 
 
 [72]
 See, e. g., Mobil Oil Corp. v. FPC, supra, note 1, 417 U.S. at 316-321, 94 S.Ct. at 2349-2352, 41 L.Ed.2d at 99-102; FPC v. Louisiana Power & Light Co., 406 U.S. 621, 626, 92 S.Ct. 1827, 1831, 32 L.Ed.2d 369, 376-377 (1972); Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 795-799, 88 S.Ct. at 1374-1377, 20 L.Ed.2d at 353-354; Cities of Fulton v. FPC, supra note 5, 168 U.S.App.D.C. at 36-37, 512 F.2d at 950-951; Moss v. FPC, supra note 6, 161 U.S.App.D.C. at 5, 502 F.2d at 465
 
 
 [73]
 E. g., Cities of Fulton v. FPC, supra note 5, 168 U.S.App.D.C. at 36-40, 512 F.2d at 950-954; Public Serv. Comm'n v. FPC, supra note 35, 167 U.S.App.D.C. at 156, 516 F.2d at 749; Consumers Union of United States v. FPC, 166 U.S.App.D.C. 276, 278-280, 510 F.2d 656, 658-660 (1974); Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 255-259, 505 F.2d at 362-366
 
 
 [74]
 See cases cited supra note 73
 
 
 [75]
 See Natural Gas Act § 19(b), 15 U.S.C. § 717r(b) (1970)
 
 
 [76]
 See, e. g., cases cited supra note 73. We have noted that "(u)nder the shadow of the nationwide shortage of natural gas, the incentive device has been seized upon increasingly by the (Commission) and paraded before the courts in a number of guises, perhaps on the assumption that the courts would be inclined to reject them all," Cities of Fulton v. FPC, supra note 5, 168 U.S.App.D.C. at 36-37, 512 F.2d at 950-951 (footnote omitted), and we have listed a number of such guises. Id. n.19. We have remained faithful to our obligation in each case to examine the record to determine whether we are faced "with a change in direction put in effect for a navigational objective, or the confusion of an agency that is rudderless and adrift." Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 115, 511 F.2d at 353
 
 
 [77]
 Memphis Light, Gas & Water Div. v. FPC, supra note 1, 164 U.S.App.D.C. at 165, 504 F.2d at 234
 
 
 [78]
 Id. Not even the spectre of an undesirable situation, "unsupported by any evidence that it could occur in fact, justifies" a regulatory procedure. Memphis Light, Gas and Water Div. v. FPC, supra note 1, 164 U.S.App.D.C. at 164, 504 F.2d at 233. What are required are "not mere fears for the future but facts and findings, a statement of reasons that is supported by concrete inferences from substantial evidence, and is not to be snatched from the air on a purely hypothetical 'worse case' analysis . . . ." Id. at 165, 504 F.2d at 234
 
 
 [79]
 As was held in Mobil Oil Corp. v. FPC, supra note 1, the Commission may under proper conditions incorporate into the "old"-gas rate a noncost factor as an incentive to expand production. "As between placing the burden of that expansion on new or second vintage gas alone or spreading it over both old and new gas, (the Commission may) judge () the latter more equitable and more likely to lead to the immediately increased capital necessary in the face of a crisis;" in other words, it may "place the burden of those payments on all users rather than on those alone who purchased gas in the future." 417 U.S. at 320, 94 S.Ct. at 2352, 41 L.Ed.2d at 102. It should be noted, however, that there the Commission compiled a massive evidentiary record, a part of which "focused on the gas shortage, projected levels of demand, and estimates of new supply needed to alleviate the problem," and another part of which bore "upon rate levels needed to induce additional supply, the potential industry consequences of any new order, and new cost trends based on (new) data. . . . " Id. at 296, 94 S.Ct. at 2340, 41 L.Ed.2d at 88. In contrast, there is no evidentiary foundation for either of the orders before us or for the order accompanying Order No. 639, upon which they are based. See notes 62-63 supra
 
 
 [80]
 See Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 331, 94 S.Ct. at 2356-2357, 41 L.Ed.2d at 107-108; Cities of Fulton v. FPC, supra note 5, 168 U.S.App.D.C. at 36, 512 F.2d at 951; Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 250, 505 F.2d at 357
 
 
 [81]
 Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 250, 505 F.2d at 357, quoting Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 331, 94 S.Ct. at 2356-2357, 41 L.Ed.2d at 107-108. See also Cities of Fulton v. FPC, supra note 5, 168 U.S.App.D.C. at 37, 512 F.2d at 951
 
 
 [82]
 Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 250, 505 F.2d at 357
 
 
 [83]
 "The Commission (is) bound to exercise its discretion within the limits of the standards expressed by the Act; and 'for the courts to determine whether the agency has done so, it must "disclose the basis of its order" and "give clear indication that it has exercised the discretion with which Congress has empowered it." ' " FPC v. Texaco, Inc., supra note 12, 417 U.S. at 396, 94 S.Ct. at 2325, 41 L.Ed.2d at 155, quoting Burlington Truck Lines v. United States, supra note 44, 371 U.S. at 167-168, 83 S.Ct. 239, 245-246, 9 L.Ed.2d 207, 215-216, in turn quoting Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197, 61 S.Ct. 845, 853-854, 85 L.Ed. 1271, 1284-1285 (1941) (emphasis in original.)
 
 
 [84]
 Supra note 35
 
 
 [85]
 Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801-802, 13 L.Ed.2d 616, 625-626 (1965); Bowles v. Seminole Rock Co., 325 U.S. 410, 413-414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702-1703 (1945); Gulf Oil Corp. v. Hickel, 140 U.S.App.D.C. 368, 372-373, 435 F.2d 440, 444-445 (1970); Udall v. Oelschlaeger, 129 U.S.App.D.C. 13, 15, 389 F.2d 974, 976 (1968), cert. denied, 392 U.S. 909, 88 S.Ct. 2056, 20 L.Ed.2d 1367 (1968)
 
 
 [86]
 Shell Oil Co. v. FPC, supra note 35, 491 F.2d at 88. Compare Public Serv. Comm'n v. FPC, supra note 35, 170 U.S.App.D.C. at 157, 516 F.2d at 750; Moss v. FPC, supra note 6, 164 U.S.App.D.C. at 8, 502 F.2d at 468; Public Serv. Comm'n v. FPC, 151 U.S.App.D.C. 307, 317, 467 F.2d 361, 371 (1972)
 
 
 [87]
 The court summarized the argument against the interpretative rule thusly:
 With "new" and flowing gas at the same price level, the producers will have no incentive to find more gas because they can reap windfall profits by selling cheap flowing gas at the higher rate formerly reserved for "new" gas. If (the Commission) required the producers to show higher costs or new production to justify the higher rate, then (the Commission) would be acting rationally. But it is irrational only to raise gas rates with no quid pro quo required. The producers will not find increased production to be in their best interest, and, as (New York Public Service Commission) puts it, they will "take the money and run."
 Shell Oil Co. v. FPC, supra note 6, 491 F.2d at 89. The court then acknowledged that:
 (New York Public Service Commission's) pessimism is understandable and may, in time, prove justified. It is true that producers who sign new contracts at the current area rates will find their "old gas" rate boosted by an increment greater than their cost increases. And it is possible, as (New York Public Service Commission) forecasts, that producers will reap the new high rates for their flowing gas without engaging in further drilling.
 Id.
 
 
 [88]
 Id. The Court explained:
 If a producer has signed a contract before the division date, all the gas he produces during the contract's life will receive the low "old gas" price. Even if he drills new wells at current costs, the "new" gas he discovers and produces will be priced as "old" gas, on the basis of historical costs computed in a year long since gone by. Since costs seem to rise inexorably with the passage of time, new drilling will become less attractive as the contract ages. For example, we think it quite likely that a producer operating under a 1964 contract may have little incentive to find expensive 1974 gas only to sell it at bargain 1964 rates. But if he can raise his prices to a uniform rate for both "new" and "old" gas when the old contract expires and a new one is signed, he might be more inclined to drill new wells.
 Id.
 
 
 [89]
 Id
 
 
 [90]
 Id. at 89-90. It had been argued that Opinion No. 639's "vintaging statement is a basic modification of (Commission) regulations, and not the permissible interpretation it is advertised to be," and that "(t)herefore the vintaging statement should have been preceded by notice and a hearing and supported by record evidence, in accordance with the rulemaking prerequisites set out in Section 4 of the Administrative Procedure Act." Id. at 87 (Footnoting 5 U.S.C. § 553 (1970)). The court disagreed because it "believe (d) the vintaging statement is a permissible interpretation, not a basic modification of rate-setting regulations," and "(w)hether we characterize the statement as an interpretation or an interpretative rule, notice, a hearing and a record were not required." Id. (citations and footnote omitted). See also Administrative Procedure Act, § 4(a), 5 U.S.C. § 553(b) (1970)
 
 
 [91]
 For this reason, I agree with my colleagues that the decision in Shell erects no barrier to our consideration of the questions whether the Commission's conclusions are supported by substantial evidence and are products of "reasoned consideration." Compare Public Service Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 103, 511 F.2d at 341
 
 
 [92]
 See cases cited supra note 7 and this Part II. My colleagues accept the orders under review as permissible applications of Opinion No. 639, and the latter in turn as a reasonable interpretation of the vintaging provisions of the applicable area-rate orders. I suggest that the inquiry should not stop at this point. The ultimate question is whether application of the "new"-gas price for what is actually "old" gas results in just and reasonable charges to the consuming public; and the answer depends upon factual conclusions fairly drawn from relevant evidence and reasoned consideration by the Commission of the pertinent factors. Until the Commission engages in these processes, the holding on interpretation obscures the real issue. See note 63 supra
 
 
 [93]
 See note 1 supra
 
 
 [94]
 See note 1 supra
 
 
 [95]
 Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 107, 511 F.2d at 345; Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 256-258, 505 F.2d at 363-365; Texas Gulf Coast Area Rate Cases (Public Serv. Comm'n v. FPC), supra note 35, 159 U.S.App.D.C. at 208, 487 F.2d at 1049; City of Chicago v. FPC, 147 U.S.App.D.C. 312, 325, 458 F.2d 731, 744 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); City of Chicago v. FPC, 128 U.S.App.D.C. 107, 115, 385 F.2d 629, 637 (1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968)
 
 
 [96]
 Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 112, 511 F.2d at 354 (footnote omitted)
 
 
 [97]
 Id. at 107, 511 F.2d at 345, quoting City of Chicago v. FPC, supra note 95, 147 U.S.App.D.C. at 325, 458 F.2d at 744
 
 
 [98]
 Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 112, 511 F.2d at 354
 
 
 [99]
 See cases cited infra note 104
 
 
 [100]
 Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 118, 511 F.2d at 346, quoting Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 318, 94 S.Ct. at 2350, 41 L.Ed.2d at 100. See also Public Serv. Comm'n v. FPC, supra note 35, 170 U.S.App.D.C. at 156, 516 F.2d at 749
 
 
 [101]
 Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 118, 511 F.2d at 346, quoting Texas Gulf Coast Area Rate Cases (Public Serv. Comm'n v. FPC), supra note 35, 159 U.S.App.D.C. at 196, 487 F.2d at 1067 (separate opinion of Leventhal, J.) (footnote omitted)
 
 
 [102]
 Public Serv. Comm'n v. FPC, supra note 1, 167 U.S.App.D.C. at 118, 511 F.2d at 346, quoting Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 792, 88 S.Ct. at 1373, 20 L.Ed.2d at 350
 
 
 [103]
 The Commission's treatment leaves a number of unanswered questions in its wake. What amount of added revenue is needed to induce development of existing gas fields to full capacity? Is that amount more or less than the added revenue that will be yielded by allowing "old" gas to be sold at the "new" price? How much of the added revenue is likely to be devoted to developmental effort? What is the likelihood that additional gas supplies thus made available will reach the interstate market? What increase in cost to consumers expectably will result from the challenged orders? Mention of these questions is not, of course, an attempt to furnish a complete list. The point is that the Commission has not tried to answer any of them, on the basis of evidence or otherwise, and no one can be certain that the Commission " 'has given reasoned consideration' and 'appropriate protection' to the public interest in not paying prices for gas substantially in excess of those needed to induce production of an adequate gas supply." Macdonald v. FPC, supra note 1, 134 U.S.App.D.C. at 256, 505 F.2d at 363
 
 
 [104]
 Cities of Fulton v. FPC, supra note 5, 168 U.S.App.D.C. at 37, 512 F.2d at 951. See also Macdonald v. FPC, supra note 1, 161 U.S.App.D.C. at 256, 505 F.2d at 363; City of Chicago v. FPC, supra note 95, 147 U.S.App.D.C. at 332, 458 F.2d at 751
 
 
 [105]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 17, 360 U.S. at 388, 79 S.Ct. at 1253, 3 L.Ed.2d at 1319
 
 
 [106]
 FPC v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333, 349 (1944). Only recently the Supreme Court pointed out that:
 It is abundantly clear from the history of the Act and from the events that prompted its adoption that Congress considered that the natural gas industry was heavily concentrated and that monopolistic forces were distorting the market price for natural gas.
 C v. Texaco, Inc., supra note 12, 417 U.S. at 397-398, 94 S.Ct. at 2326, 41 L.Ed.2d at 156. The "only justification for giving the Commission the duty to regulate prices was the determination by Congress that the producers have a supply that is so restricted in relation to demand that they have the economic power to bargain for prices that will be injurious to the public." United Gas Improvement Co. v. FPC, 290 F.2d 133, 135 (5th Cir.), cert. denied, 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961). See also Macdonald v. FPC, supra note 1, 164 U.S.App.D.C. at 257, 505 F.2d at 364.
 
 
 [107]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 17, 360 U.S. at 388, 79 S.Ct. at 1253, 3 L.Ed.2d at 1319
 
 
 [108]
 "The Commission may not exceed its authority under the (Natural Gas) Act; its orders are subject to judicial review; and reviewing courts must determine whether Commission orders, issued pursuant to indirect regulation, are supported by substantial evidence and whether it is rational to expect them 'to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risk they have assumed, and yet provide appropriate protection to the relevant public interest, both existing and foreseeable.' " FPC v. Texaco, Inc., supra note 12, 417 U.S. at 393, 94 S.Ct. at 2324, 41 L.Ed.2d at 154, quoting Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 792, 88 S.Ct. at 1362-1363, 20 L.Ed.2d at 350. See also Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 309, 94 S.Ct. at 2346, 41 L.Ed.2d at 96
 
 
 [109]
 See text supra at note 43
 
 
 [110]
 See note 116, infra
 
 
 [111]
 Supra note 1
 
 
 [112]
 164 U.S.App.D.C. at 258 n.37, 505 F.2d at 365 n.37
 
 
 [113]
 Id
 
 
 [114]
 Id
 
 
 [115]
 Id. at 258, 505 F.2d at 365
 
 
 [116]
 Compare Mobil Oil Corp. v. FPC, supra note 1, where the Commission's order advanced incentives in the form of price escalations and refund-workoff credits contingent upon new dedications of gas to the interstate market, 417 U.S. at 298-300, 94 S.Ct. at 2340-2341, 41 L.Ed.2d at 89-90 programs on which the consuming public could not possibly lose. The Supreme Court approved. "(I)t was well within Commission discretion and expertise," the Court said, "to conclude that the refund workoff credits and contingent escalations could provide opportunity for increased prices that would help in generating capital funds and in meeting rising costs, while assuring that such increases would not be levied upon consumers unless accompanied by increased supplies of gas." Id. at 317-318, 94 S.Ct. at 2350, 41 L.Ed.2d at 100. And see the order reviewed in Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, discussed in text supra at notes 25-34
 Compare also Cities of Fulton v. FPC, supra note 5, where the Commission conditioned approval of a gas sale, at applicable area rates in lieu of rates based on cost of service, upon expenditure of the excess of the new rates over the old rates in the development of new gas reserves, that amount to be spent over and above amounts already projected for exploration and development. The Commission also required refunds at a specified rate for each unit of gas by which the producers' effort fell short of the estimated yield of new gas. 168 U.S.App.D.C. at 35, 512 F.2d at 949. We sustained the Commission's action. 168 U.S.App.D.C. at 37-41, 512 F.2d at 951-956.
 And see Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, where the area rate order provided in part that the higher maximum rate would be applied retroactively to a period antedating the order. The Court observed that "(i)t is difficult to see how the higher rate could reasonably have been expected to encourage, retrospectively, exploration and production that had already occurred," with the result that "(t)here is thus force in (the) contention that this arrangement is not fully consistent with the logic of the two-price system." 390 U.S. at 798, 88 S.Ct. at 1376, 20 L.Ed.2d at 354 (footnote omitted). The Court upheld the provision because the Commission evidently believed that it was responsible for producer expectations of higher prices for initial filings, and a price reduction with accompanying refunds might have diminished confidence in interstate prices and thereby threatened the interstate supply. Id. at 798-799, 88 S.Ct. at 1376-1377, 20 L.Ed.2d at 354.
 
 
 [117]
 See text supra at notes 57-61
 
 
 [118]
 Cities of Fulton v. FPC, supra note 5, 168 U.S.App.D.C. at 38, 512 F.2d at 952
 
 
 [119]
 Compare Transcontinental Gas Pipe Line Corp. v. FPC, 160 U.S.App.D.C. 1, 5, 488 F.2d 1325, 1329 (1973); cert. denied, 417 U.S. 921, 94 S.Ct. 2629, 41 L.Ed.2d 226 (1974); Michigan Consolidated Gas Co. v. FPC, 108 U.S.App.D.C. 409, 431, 283 F.2d 204, 226, cert. denied, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960). Since the stated purpose of eliminating vintaging was to encourage maximum development of committed acreage, see text supra at note 43, it seems clear that the Commission might have attained that goal simply by substituting vintaging by date of commencement of well-drilling in place of vintaging by contract date. See Rocky Mountain Area Rate Proceeding (Opinion No. 658), supra note 35, 49 F.P.C. at 942-943
 
 
 [120]
 Mobil Oil Corp. v. FPC, supra note 1, 417 U.S. at 307, 94 S.Ct. at 2345, 41 L.Ed.2d at 94, quoting Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 767, 88 S.Ct. at 1360, 20 L.Ed.2d at 336, in turn quoting FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 287-288, 88 L.Ed. 344-345 (1944)
 
 
 [121]
 See Part II supra
 
 
 [122]
 See Part III supra
 
 
 [123]
 See text supra at notes 10, 105-107
 
 
 [124]
 See text supra at note 11
 
 
 [125]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 1, 390 U.S. at 791, 88 S.Ct. at 1372-1373, 20 L.Ed.2d at 350